No. 47,642

KANSAS-NEBRASKA NATURAL GAS COMPANY, INC., *Appellee* and *Cross-Appellant,* v. THE STATE CORPORATION COMMISSION OF THE STATE OF KANSAS, DALE E. SAFFELS, Chairman; JULES V. DOTY and VERNON A. STROBERG, Commissioners; and Their Respective Successors in Office as Members of the State Corporation Commission of the State of Kansas, *Appellant* and *Cross-Appellee,* and CENTRAL KANSAS POWER COMPANY, INC., *Intervenor.*

(538 P. 2d 702)

 Opinion filed
July 17, 1975. 

*Sard Fleeker,* acting general counsel, argued the cause, and *Warren C. Hummer,* assistant general counsel, was with him on the briefs for appellant and cross-appellee.

*Richard C. Byrd,* of Anderson, Byrd and Richeson, of Ottawa, argued the cause, and *Larry D. Hall,* of Hastings, Nebraska, *Sam W. G. Lowe,* of Lowe and Willoughby, of Colby, and *Richard Jones,* of Hershberger, Patterson and Jones, of Wichita, were with him on the brief for the appellee and cross-appellant.

*Clifford R. Hope, Jr.,* of Fleming, Haag, Hope, Osborn and Mills, of Garden City, and *James C. Mordy,* of Morrison, Hecker, Curtis, Kuder and Parrish, of Kansas City, Mo., were on the brief for the intervenor.

*Arthur J. Doyle,* of Kansas City, Mo., and *Thomas E. Gleason* and *Thomas E. Gleason, Jr.,* both of Ottawa, were on the brief *amicus curiae* for Kansas City Power and Light Company.

The opinion of the court was delivered by

HARMAN, C.: This is an appeal by the state corporation commission from a district court order vacating a commission order denying interim rate relief to Kansas-Nebraska Natural Gas Company, Incorporated, pending final decision by the commission on Kansas-Nebraska's application to make certain changes in its charges for natural gas service. Meanwhile the corporation commission complied with the district court's order by permitting the requested interim rates to go into effect under a refunding obligation.

Kansas-Nebraska (referred to hereafter as K-N or appellee) is engaged in the production, purchase and gathering of natural gas in Kansas, Nebraska, Oklahoma, Colorado, Wyoming and Texas, its sale at wholesale in Oklahoma, in its transmission, sale at wholesale and retail distribution in Kansas, Nebraska and Colorado, and its transmission and retail distribution in Wyoming. It provides gas service to customers in the four states through a system of interconnected pipelines extending from the various sources of supply in those states and Texas. Its facilities for the transportation of natural gas in interstate commerce and its sales for resale in Nebraska and Colorado and to three gas distribution companies in Kansas are subject to regulation by the Federal Power Commission. To the extent the company's facilities and sales in Kansas, Colorado and Wyoming are not subject to FPC jurisdiction, they are under

the regulatory authority of the respective state utility commissions in those states (in Nebraska retail gas rates are regulated by each municipality served).

By way of prelude to the present proceeding it may be noted that on July 5, 1972, K-N filed with the Kansas corporation commission (sometimes referred to hereafter as KCC) an application for increased rates for natural gas services to its Kansas customers whose rates are regulated by KCC, based on a test year ending February 29, 1972, in which a 9.47% rate of return was sought (Docket No. 95,765-U). KCC approved an annual increase of approximately $703,000 effective May 7, 1973, and a purchased gas tracking increase of approximately $205,000 and it made a finding that a rate of return within the range of 8.03 to 8.35% on the Kansas jurisdictional rate base was reasonable. Application for judicial review filed with the Finney county district court resulted in an additional annual revenue increase of $100,000. The new rates, reflecting a rate of return of 8.10%, went in effect September 26, 1973.

On October 26, 1973, K-N filed another application with KCC requesting permission for a further increase in rates (Docket No. 95,957-U). The proposed increase was based on a test year of May 1, 1972, through April 30, 1973. A rate of return of 9.78% was sought. The date the application was filed KCC issued an order assessing the costs of investigation of the application against K-N and thereafter employed Elmer Fox and Company, certified public accountants, to assist its staff in reviewing K-N's books and records. Fox, through its partner at Russell, Mr. Don L. Arnold, commenced its review of K-N's records March 4, 1974, and completed the field work on April 12, 1974. Meanwhile, on March 6, 1974, K-N filed its motion for interim relief with KCC seeking permission to place into effect on a temporary basis, subject to refund on final decision, the proposed new rates sought in the October 26, 1973, rate application. The motion, which is the subject of this appeal, cited increased costs, delay in Fox's investigation with consequent delay in decision of the main application, and gas conservation measures adopted by its customers as factors reducing its earnings to such a level that interim rate relief was necessary to prevent confiscation of its property by denial of a fair rate of return.

The motion for interim rate relief was heard by KCC on April 16 and 23, 1974. Several utility customers of K-N were permitted to intervene, including Central Kansas Power Company, Inc. At the

hearing K-N offered four exhibits and the testimony of James Asbury, its vice-president of operations, and Hassel Sanders, its vice-president of accounting. Their testimony was directed toward showing that as a result of its customers' recent conservation efforts there had been a drastic reduction in sales volumes. Mr. Asbury predicted an annual reduction of six percent in domestic and commercial sales volume. The predictions were based principally on a test comparing a three-day average peak consumption in three Kansas towns (Quinter, Leoti and Tribune) during the months of January, 1973, and December, 1973 (K-N used January, 1973, in making the test rather than December, 1972, because in the latter month an unusual amount of gas had been delivered for commercial grain drying operations). This test indicated a ten percent decline in deliveries for the winter season. Mr. Sanders testified he revised K-N's initial proposed rate schedules taking into account increased costs of service and decreased revenue due to customer conservation efforts. His conclusion was that after projected adjustments K-N was earning only 1.26% return on its property in Kansas under the present rates. The rates proposed in the October 26, 1973, application were based on a new allocation formula used in arriving at a rate base for Kansas customers. In previous rate cases K-N had started with only that part of its facilities in Kansas, Oklahoma and Texas which were utilized for delivery of gas to its Kansas customers. Facilities located in Wyoming, Colorado and Nebraska, not utilized for delivery of gas to Kansas customers, were excluded as not being used or useful to them. In the current application K-N started with its entire plant system except for an isolated local distribution system in Texas, and then allocated its system-wide plant and expenses between its Kansas jurisdictional customers and its other customers on the basis of annual, peak and winter heating season volumes and annual and peak MMcf-miles. K-N had not previously used this method of allocation before KCC. In its motion for interim rate relief K-N asserted that based on its new projections it can expect to receive $6,728 per day less revenue until its proposed rates are put into effect.

On May 29, 1974, KCC denied K-N's motion for interim rate relief. In its memorandum order it summarized the evidence before it and then made the following findings of fact and conclusions of law:

"2. There is no specific statutory provision for the granting of interim rate relief on an emergency basis as sought by Applicant and although the Com-

mission is vested with broad power to regulate public utility rates, adjustments in rate cases cannot be made on speculation and conjecture.

"3. That the Commission has jurisdiction to consider and determine the question of interim rates on an emergency basis. The burden, however, is upon the Applicant to prove the need for emergency rate relief with evidence indicating that earnings have declined to such a point that the utility cannot be expected to continue to render efficient and sufficient service to its customers.

"4. That the Applicant has not sustained its burden of proof, and that the decline in the company's earnings is not of such an adverse nature as to warrant the extraordinary remedy of emergency rate relief. Such decline does not threaten the financial integrity of the company, nor does it threaten the continuation of reasonably efficient and sufficient service to the public. The company is not suffering a usurpation or confiscation of its property by reason of its existing rates. The record is devoid of any threatened reduction of service to customers resulting from a lack of sufficient capital or operating revenues.

"5. That at least a portion of Applicant's financial problem has been brought on by the management policy decision to husband natural gas in a period where conservation measures by residential users have decreased sales to that class of customers. At the same time, interruptions of industrial customers are at the highest level in the company's history. This policy has contributed substantially to Applicant's decrease in revenue. The Applicant has proven reserves of over 16 years. It cannot be said that conservation measures by residential customers are entirely responsible for the company's decreased revenue picture.

"6. The Applicant has based its Motion, in large part, on studies of sales through one heating season to show the effect of conservation on sales and has annualized the results. No concrete data was available to indicate what effect conservation measures would have on usage during summer months. The Applicant has merely speculated as to what the total annual effect conservation measures will have on sales. In fact, there was no evidentiary data that conservation efforts exercised during the last heating season, from which Applicant made its study, will be permanent or have any lasting effect. Again, such an assumption by the Applicant is purely speculative. Emergency rate relief, or for that matter permanent rates, cannot be granted on speculation or conjecture. The Applicant has the burden of showing by concrete evidence that the company is in such a position that if emergency rate relief is not forthcoming, the company will not be able to reasonably serve its customers, meet day to day operating expenses, or meet current payroll requirements. Here the Applicant has not met the required burden.

"7. There has been no showing that the Applicant cannot acquire adequate capital. On its face, the 1973 Annual Report issued by the Applicant, is favorable, indicating a dividend of $1.09 per share on common stock, based on company earnings per share in 1973 of $2.10.

"8. In the past, such as in Docket No. 95,765-U, this Applicant's last request for rate adjustments, the Commission adopted a specific Mcf mile allocation formula appropriate to Kansas-Nebraska. Applicant now urges a new allocation procedure in this case that has never before been proposed by the Applicant or considered by this Commission. For this Commission to grant interim rate relief before fully analyzing and evaluating the untested allocation

procedure presented by the Applicant would be patently reckless. Such an authorization is not in the public interest and is not a sound regulatory act by this Commission.

"9. Company figures indicate that for the test year ending April 30, 1973, revenue from Kansas jurisdictional sales was $10,326,293 and that for the same period jurisdictional cost of service was $12,865,302, which left a deficiency of $2,539,009. Kansas-Nebraska's witnesses indicated that since the end of the test year, that the company made a study of the effect conservation measures have had on the deficiency in revenue. The company indicated that when conservation measures are taken into consideration the Kansas jurisdictional revenue would be $9,612,995, the cost of service would be $12,464,029, which results in a deficiency of $2,851,034. Both sets of figures for the test year are predicated on the new allocation formula proposed by the Applicant and in order for this Commission to arrive at the computations presented by the Applicant, this Commission must subscribe to all of the adjustments made to the base period to arrive at the test period and accept as presented, the proposed allocation procedure, including construction in progress. The Applicant has not considered in any of its calculations reduction of expenses due to increased curtailments which resulted in an increase in unsold gas, its figures for purchased gas, or increased revenues from extracted products. This Commission believes that to grant interim rate relief on the evidence presented would be entirely too tenuous.

"10. The Applicant suggests that it is losing $6,278 per day in increased revenue and that since December 1, 1973, this has added up to loss of increased revenue of $860,085. These figures are also presented by the Applicant based on the supposition that this Commission will be in total agreement with all respects of the proposed allocation formula. This Commission would indeed be derelict in its duty to approve interim rate relief, an extraordinary remedy, without first fully considering this new allocation formula."

K-N thereafter filed an application for rehearing which was denied. It then filed an application for judicial review in the district court of Finney county, requesting that KCC's order be vacated and set aside. K-N also filed in that court an application for stay of KCC's order of denial and requested that KCC be enjoined from preventing it from implementing the interim rates pending determination of its application for an increase in rates.

Transcripts of the hearings before KCC were filed in the district court. On August 9, 1974, following an informal hearing that court entered an order staying KCC's order denying the interim rates and it remanded the matter to KCC with directions to issue a proper interim rate order within twenty days or the interim order requested by K-N would go into effect. KCC promptly filed notice of appeal to this court from the district court's August 9th order and also requested this court to stay that order. After a hearing held August

28, 1974, this court denied KCC's request for stay, reserving ruling on the merits of the appeal.

Rather than issuing its own order implementing interim rates KCC on August 29, 1974, accepted and filed the rates tendered by K-N. On October 15, 1974, the district court heard K-N's application for review of KCC's order denying interim relief. The district court's final order of that date included the following:

"The Court, being fully advised in the premises, makes the following Findings of Fact and Conclusions of Law for the purpose of deciding the Application of Judicial Review:

### "FINDINGS OF FACT

[Findings 1, 2 and 3 recite procedural history].

"4. [Here the district court identified the witnesses and exhibits presented at the hearings held before KCC on April 16 and 23, 1974].

. . . . . . . . . . . . . .

"The Court's factual determinations are based upon the testimony of the above named witnesses and the contents of the exhibits outlined above.

"No evidence was presented to the Commission in the proceeding regarding the current earnings of the company pertaining to its Kansas jurisdictional customers except that presented by Kansas-Nebraska's witnesses.

"5. [Recites further procedural history].

"6. The evidence presented showed that as a result of conservation energy programs established by the Federal Government that sales by Kansas-Nebraska were reduced and probably would be reduced in the future and that the energy conservation program would have a detrimental effect upon Kansas-Nebraska's sales and revenue.

"7. Kansas-Nebraska's Rate Application was prepared and filed prior to the initiation of conservation measures by its customers and reflected without regard to any such conservation measures a claimed annual revenue deficiency of $2,539,009.00. Adjustment of that revenue deficiency to reflect the effect of energy conservation increases the anticipated claimed annual revenue deficiency of $2,851,034.00, resulting in current earnings by Kansas-Nebraska on its property in Kansas under existing rates of only 1.26%. The result is a claimed average daily loss of revenue to Kansas-Nebraska of $6,278.00. The above mentioned claimed return of 1.26% on Kansas-Nebraska's property in Kansas is not a fair return and is not sufficient to enable Kansas-Nebraska to attract additional capital and will seriously hinder the company's efforts to secure new and additional supplies of natural gas and to render efficient and sufficient service to its customers.

"8. The Court finds that the evidence presented by Kansas-Nebraska was sufficient to show a serious deterioration in Kansas-Nebraska's sales and revenue and was sufficient to require the Corporation Commission to apply its discretionary authority to the question of whether or not an interim rate should be established. The Corporation Commission refused to consider an interim rate increase based upon the Commission's legal conclusion that the proper standard to be applied in determining whether interim rate increase should be con-

sidered was that the decline in sales and revenue had to be sufficient to threaten the financial integrity of the company, threaten its ability to continue reasonably their efficient and sufficient service to the public and sufficient to threaten a reduction of service to customers resulting from a lack of sufficient capital or operating revenues. In addition, the Corporation Commission found that it would be necessary for the company to show it could not meet day to day operating expenses or meet the current pay roll requirements before an interim rate increase could be considered.

"CONCLUSIONS OF LAW

"1. [Recites venue and jurisdiction].

"2. The State Corporation Commission of the State of Kansas had jurisdiction to entertain Kansas-Nebraska's Motion for, and to grant, interim rate relief on a showing by the Company of a significant current deficiency in the return on its Kansas property yielded by existing rates.

"3. The Court concludes that by virtue of the failure of the Corporation Commission to apply a proper standard for determining when interim rates should be considered and that by its use of the very severe standard which it adopted the Corporation Commission has in effect refused to apply its discretionary consideration to the question of whether or not interim rate increase should be considered. The Court finds that this action is arbitrary, capricious, unlawful and will result in the confiscation of property of Kansas-Nebraska without due process of law. The Court further finds that in view of the long delay in determining what action should be taken upon Kansas-Nebraska's original application for rate increase that the failure to fairly consider the granting of an interim rate increase compounds the error of the Commission and makes its failure to fairly consider an interim rate increase more arbitrary, capricious, unreasonable and unlawful.

"4. This Court finds that the May 29, 1974, Order of the State Corporation Commission denying Kansas-Nebraska's Application for Interim Rate Relief is unlawful and unreasonable in its entirety and said Order should be vacated and set aside, and the Order of this Court granting stay, which provided that in the event the Commission does not promulgate and issue a proper interim rate order within twenty days from August 9, 1974, that the interim rate order requested by Kansas-Nebraska go into effect, thereby permitting Kansas-Nebraska to collect new rates on all gas delivered on or after August 29, 1974, should continue in full force and effect.

"5. [Approves refunding bond filed by K-N].

"6. This decision of the Court and the findings made by the Court based upon the evidence presented at the hearings before the Commission on April 16 and 23, 1974, apply only to the question of whether or not the Corporation Commission should have considered in its discretion the granting of an interim rate and do not in any way concern the ultimate decision as to what the proper final rate should be."

KCC appealed from the final order granting interim relief and upon its application this appeal has been consolidated with its appeal from the trial court's August 9, 1974, order. K-N filed a cross-appeal from that portion of the court's October 15, 1974, order

limiting application of the new rates to gas delivered on or after August 29, 1974, contending instead the new rates should have been applicable to billings for gas made on or after August 29, 1974.

All parties before this court agree on a preliminary matter—that despite the lack of specific statutory authority spelling it out, KCC has power to grant interim or temporary rates for public utilities regulated by it—they urge this court to so rule. We state no new principle in obliging. In its order KCC ruled it had this authority, and correctly so under our statutes and case law.

In *Southwestern Bell Tel. Co. v. State Corporation Commission,* 192 Kan. 39, 386 P. 2d 515, it was stated:

"The regulation of public utilities, including the fixing of rates, is a legislative function. The legislature has seen fit to delegate its authority, with broad powers, to the State Corporation Commission. (G. S. 1949, 66-101.) The only statutory standard controlling the Commission in fixing rates for public utilities is that the rates must be just and reasonable. . . ." (p. 46.)

K. S. A. 66-101 states that the corporation commission is given full power, authority and jurisdiction to supervise and control public utilities and "is empowered to do all things necessary and convenient for the exercise of such power, authority and jurisdiction". K. S. A. 66-110 makes it the duty of the commission to investigate all rates and upon a finding after full hearing that such rates are unjust, unreasonable, unjustly discriminatory or unduly preferential, gives the commission power to fix such rate as shall be just and reasonable. K. S. A. 66-117 provides that to make any change in any rate a schedule showing the desired change must be filed with the commission and that no changes shall be made in any rate without the consent of the commission. K. S. A. 66-141 states:

"The provisions of this act [public utilities] and all grants of power, authority and jurisdiction herein made to the commissioners, shall be liberally construed, and all incidental powers necessary to carry into effect the provisions of this act are hereby expressly granted to and conferred upon the commissioners."

Finally on this point, in *Elliott v. Empire Natural Gas Co.,* 123 Kan. 558, 256 Pac. 114, it was contended the public service commission (predecessor of KCC) had no power to fix temporary public utility rates. In rejecting the contention this court quoted approvingly from *Chicago Rys. Co. v. City of Chicago,* 292 Ill. 190, 126 N. E. 585, as follows:

" 'To sustain the judgment of the circuit court, it is insisted that the commission had no authority to fix a temporary rate based upon increased operating

expenses, and could only make a change upon a full hearing and examination which would demonstrate what a permanent rate ought to be. So far as we have been informed, every court which has considered that question has decided to the contrary.' [Citations.] (p. 202.)" (p. 563.)

KCC contends upon appeal that the trial court erred in its findings Nos. 6, 7 and 8 in that it substituted its judgment for that of KCC contrary to the scope of judicial review prescribed in K. S. A. 66-118d; that it similarly erred in its conclusions of law 2 and 3, and further erred in rendering the judgment that it did after failing to find there was no substantial competent evidence to support KCC's order. The thrust of its argument is that its denial order was based upon substantial competent evidence, mandating judicial approval. In opposition appellee K-N counters that the current rate of return was so inadequate as to amount to a confiscation of its property; that the trial court correctly applied the just and reasonable standard and correctly concluded K-N had sustained its burden of proof; and that KCC had set too stringent a standard for the grant of interim relief. We deal with the latter contention first.

KCC did state in its order that K-N had the burden of showing it was in such a position that if emergency relief was not forthcoming it would not be able reasonably to serve its customers, meet day by day operating expenses or meet its current payroll expenses. As already indicated the only statutory direction for rate determination is that the rates be reasonable and just. Although KCC must have some flexibility in determining what is reasonable and just under the particular circumstances, we think requiring a showing of virtual impending bankruptcy is indeed too stringent a standard to be fixed before interim rate relief can be granted. K-N does point out the delay necessarily involved in the rate-making process despite the best efforts of all concerned and the deleterious effect meanwhile of spiraling inflation. Rate-making agencies in other states have come up with various criteria to be used in granting interim relief, few of which have been the subject of judicial review. This latter situation may derive from the fact interim rates are generally placed into effect under a refunding obligation so that it is difficult for those on either side of the fence to demonstrate damage from the grant of interim rates.

Both sides here do cite a broad path taken by the Michigan public service commission in *Re Michigan Consolidated Gas Co.*, 88 PUR 3d 168. There it was ruled that to warrant a temporary rate increase in the course of fixing final rates, there should be at least one of the

following conditions in existence, besides the obvious requirement of a revenue deficiency: (1) Inability to arrange debt financing at reasonable rates without improved revenues, (2) distinctive and sudden decline in revenues, (3) evidence of unreasonable and harmful loss of revenues if partial rate relief is deferred, (4) reasonable grounds to believe that denial of such interim relief would cause irreparable harm to the utility. Although some of these criteria are specific in nature there is an overlapping of a sort which can scarcely be avoided in attempting to prescribe general guidelines. Necessarily, the determination as to whether a situation warrants the grant of interim rate relief to a public utility rests in the sound discretion of the corporation commission within the perimeter of reasonableness and justice to the utility and those served by it. We think that whether an interim rate should be granted pending final decision should ordinarily depend on whether irreparable harm would result to the utility by reason of a distinctive and sudden deficiency in revenue which is not subject to recovery. The fact that a utility is unable to arrange necessary debt financing at reasonable rates without improved revenues manifestly could be a condition warranting the grant of interim rate relief. This condition is mentioned only by way of illustration and it is not meant that others of like import are to be excluded as grounds for such relief.

This conclusion with respect to the standard to be applied does not necessarily mean that mention of an improper standard by KCC in its order of denial of interim rate relief invalidates that order. As suggested by intervenor Central Kansas Power in its brief, mention by KCC of the standard in the particular fashion may have been simply in responsive denial of K-N's portrayal in its motion that it was in dire financial straits and its claim to the proposed increased rates "to protect its financial integrity" and to permit it "to render efficient and sufficient service. . . ." In its denial order KCC summarized the evidence pro and con and made detailed evidentiary findings of fact. It does not appear that use of the standard we have just disapproved evidenced bias or prejudice by KCC in reaching those findings so as to taint their validity. Those findings clearly reflected that K-N had not made sufficient showing that its current rates were no longer just and reasonable. The district court did not set those findings aside for want of evidence to support them. The fact remains, KCC based its denial order on far

more than the failure to meet the challenged standard respecting the burden of proof.

K. S. A. 66-107 provides:

"Every . . . public utility governed by the provisions of this act shall be required . . . to establish just and reasonable rates . . . and every unjust or unreasonable discriminatory or unduly preferential . . . rate . . . demanded, exacted or received is prohibited and hereby declared to be unlawful and void. . . ."

K. S. A. 66-115 provides that all rates fixed by the commission shall be prima facie reasonable until changed or modified by the commission or pursuant to court proceedings. Thus K-N, as applicant, had the burden of making a prima facie showing that its current rates, due to existing circumstances, were no longer just and reasonable and that interim rate relief was necessary. Acceptable methods of accounting procedures are to be used in determining and allocating costs and rate bases. See *Southwestern Bell Tel. Co. v. State Corporation Commission,* supra, Syl. ¶ 3. The fact that rate increases cannot be made retroactive and failure to grant interim increases may result in an unrecoverable loss of revenue during the interim period does not relieve an applicant from this burden. We do not mean to say that a full-blown hearing on every possible issue is necessary before interim rate relief can be granted but at least a showing of need, acceptable on its face, should be made. The difficulty here lies largely in the fact that at the same time K-N applied for interim relief on the basis of projected income calculated largely on tests of a limited nature it also chose to use a new and questionable method of allocation of rate structure and expense.

In its denial order KCC made express findings that K-N had failed for a number of stated reasons to support the contentions its current rate of return was inadequate and further that its evidence was speculative and conjectural in several areas. These findings upon which its denial order was essentially based were supported by substantial competent evidence. KCC found that part of K-N's drop in revenue was brought about by the latter's policy decision to increase substantially interruptibles to its industrial customers—in Kansas these have been increased 30 to 40% and at the same time substantial gas reserves have been maintained. The principal reason for the requested interim relief was residential customer conservation measures evidenced during a three-day peak period in three Kansas towns; this brief period was immediately following presidential, gubernatorial and other appeals for gas conservation

which were given wide publicity. The evidence showed that in making the tests certain physical factors which might affect gas usage were not taken into account; no evidence was shown as to the effect, if any, on gas usage during the rest of the season. In projecting its revenues K-N did not take into consideration certain concomitant reduction of expenses nor certain increased revenues such as from sales of extracted products. More importantly, in presenting its case K-N had chosen to use a new method of allocation in determining the rate base applicable to Kansas, as already mentioned. The propriety of the use of this method was not supported or justified in the record—in fact it was seriously challenged. Several substantial items of expenditure and rate base adjustments under it were questioned and answers were not supplied. For example, no information as to terms, time of payment, use of payment, connection with Kansas, etc., was shown for an addition to K-N's net utility plant of $10,000,000 for an "advance payment" to a wholly-owned subsidiary, supposed to be used over a three year period in drilling wells in Montana near the Canadian border, many miles beyond K-N's transmission system. This was one of several controversial items used in determining and allocating actual investment which were left largely unexplained.

The trial court in findings Nos. 6, 7 and 8 did make certain factual findings which were at odds with those made by KCC. In findings Nos. 6 and 7 it laid the blame for decreased revenues at the hands of consumer conservation measures. No mention was made of the integrity of the three-day test period, the speculative nature of the projection for the full year based thereon, the questioned rate base and cost of service adjustments, the loss of revenue due to factors other than customer conservation, and finally, the new unsubstantiated method of allocation. Clearly it would appear the trial court reweighed the evidence in the record and came up with a different set of facts from those determined by KCC as set out in its evidentiary findings 5 through 9. In doing so and in its conclusions as well the court erred.

K. S. A. 66-118d. limits the review of a district court of an order of the corporation commission to determining whether the order is lawful and reasonable. An order is lawful if the prescribed statutory and procedural rules are followed in making the order (*Southern Kansas Stage Lines Co. v. Public Service Comm.*, 135 Kan. 657, 11 P. 2d 985). An order of the corporation commission based upon substantial competent evidence will generally be considered reason-

able. On review of an order of the state corporation commission, the district court may not vacate or set aside such order merely on the ground that such court would have arrived at a different conclusion had it been the trier of facts. It is only when the commission's determination is so wide of the mark as to be outside the realm of fair debate that the court may nullify it (*Graves Truck Line, Inc., v. State Corporation Commission,* 215 Kan. 565, Syl. ¶ 5, 527 P. 2d 1065).

When the record before KCC is viewed in the light of the foregoing standards of judicial review the trial court's judgments must be set aside and KCC's order of May 29, 1974, reinstated as a lawful and reasonable order.

Once it is determined K-N failed to make the requisite showing for a need for interim rate relief, we do not reach its contention of confiscation based as it is on K-N's proposed adjustments and new rate structure nor is there anything left in its cross-appeal to be determined.

The judgments are reversed and the cause remanded for further proceedings in accord with the views herein expressed to include direction of refund by appellee of the interim rate increase received by it.

APPROVED BY THE COURT.

FROMME, J., not participating.