(794 P.2d 1165)

Nos. 64,975
65,042

KANSAS GAS AND ELECTRIC COMPANY, *Appellant*, v. THE STATE CORPORATION COMMISSION OF THE STATE OF KANSAS, *Appellee*, and BEECH AIRCRAFT CORPORATION, *et al.*, *Appellants*, v. THE STATE CORPORATION COMMISSION OF THE STATE OF KANSAS, *Appellee*.

Opinion filed June 29, 1990.

*William D. Johnson* and *Edgar M. Roach, Jr.*, of Hunton & Williams, of Raleigh, North Carolina, and *Ralph B. Foster*, *Gerald R. Deaver*, and *J. Michael Peters*, of Wichita, for appellant Kansas Gas and Electric Company.

*Curtis M. Irby*, of Bonwell, Foster, Irby & Ellis, of Wichita, for appellants/ industrial intervenors Beech Aircraft Corporation, Coleman Company, Inc., LaFarge Corporation, Total Petroleum, Inc., and Texaco, Inc.

*Charles V. Garcia*, assistant general counsel, and *Frank A. Caro, Jr.*, general counsel, Kansas Corporation Commission, for appellee.

*Robert V. Eye*, of Lawrence, and *William G. Riggins*, general counsel, Citizens' Utility Ratepayers Board, for intervenor.

Before BRAZIL, P.J., BRISCOE AND LARSON, JJ.

BRAZIL, J.: Kansas Gas and Electric Company (KG&E) and Beech Aircraft Corporation, The Coleman Company, Total Petroleum, Inc., LaFarge Corporation, and Texaco, Inc., (the industrial intervenors) appeal the Kansas Corporation Commission's (KCC) decision finding fuel costs were imprudently incurred during outages at the Wolf Creek Generating Station (Wolf Creek) and ordering a $6.9 million refund with interest to KG&E's customers. We affirm in part, reverse in part, and remand.

In September 1987, Wolf Creek embarked on a refueling outage scheduled to last 49 days. The refueling outage actually lasted 101 days and a subsequent, unscheduled outage on January 21, 1988, lasted another 26 days. As part of a general investigation into excess energy costs incurred during the 1987-88 extended outages at Wolf Creek, the KCC, on its own motion, ordered KG&E to show cause by an order dated December 30, 1988, why KG&E should be allowed to retain $6,415,582 of excess costs charged to Kansas ratepayers during the unscheduled outage periods. The industrial customers subject to KG&E's Retail Energy Cost Adjustment Clause intervened in the action. The Citizens' Utility Ratepayers Board (CURB), representing residential and small commercial customers, also intervened.

After a hearing, the KCC issued an order finding imprudence and mismanagement during the 1987-88 outages in question. The KCC further adopted the KCC staff's calculation of refund rather than relying on KG&E's Retail Energy Cost Adjustment Clause (ECA clause) to determine the refund. In so doing, the KCC found a 49-day outage schedule to have been prudent and the balance of the outage to have been avoidable, and ordered KG&E to refund $6,923,457 in three equal lump sums, payable annually. (The $6,415,582 refund proposed in the show cause order as-

sumed a 56-day outage schedule.) The refund included 9.8836 percent interest from the time the overcharges were incurred until the time each refund is made. Chairman Henley dissented from the decision.

Both KG&E and the industrial intervenors timely applied for judicial review, and those applications were consolidated for argument and decision by this court.

We are first confronted with the question of this court's jurisdiction to hear the appeal. K.S.A. 1989 Supp. 66-118a(b) provides in relevant part: "The court of appeals shall have exclusive jurisdiction to review any agency action of the state corporation commission arising from a rate hearing requested by a public utility or requested by the state corporation commission when a public utility is a necessary party." KG&E is clearly a public utility as defined in K.S.A. 66-104; *i.e.*, it is a company "for the production, transmission, delivery or furnishing of heat, light, water or power." The jurisdictional question here is whether the agency action arises from a rate hearing.

KG&E's position is that the ECA clause is a rate because it involves the pricing of a product to customers. *In re Application of Southwestern Bell Tel. Co.*, 9 Kan. App. 2d 525, 685 P.2d 304, *rev. denied* 236 Kan. 875 (1984). The KCC's position, as announced in its order, is that the ECA clause is a tariff and not a rate and that the hearing appealed from was not a rate hearing.

Two recent Court of Appeals decisions have addressed this jurisdictional issue. *In re Application of Southwestern Bell Tel. Co.*, 9 Kan. App. 2d 525, involved approval of tariffs which had been severed from the underlying rate case because of the need to expedite the rate case. Jurisdiction was found to lie with the Court of Appeals based on two factors: "(1) the close relationship between this case and the prior rate case; and (2) the similarity of the involved tariff to a rate schedule." 9 Kan. App. 2d at 529. The court added a cautionary note, however:

"The conclusion that this court has jurisdiction in this case does not mean that all cases involving tariffs are directly appealable to this court under K.S.A. 66-118a. For example, questions of tariff interpretation should be appealed to the district court. *Southwestern Bell Tel. Co. v. Kansas Corporation Commission*, 233 Kan. 375 [, 664 P.2d 798 (1983)]. If the tariff is closely related to a prior rate case or if it is similar to a rate schedule,

jurisdiction will more likely be with this court than with the district court." 9 Kan. App. 2d at 531.

*MAPCO Intrastate Pipeline Co. v. Kansas Corporation Comm'n,* 10 Kan. App. 2d 527, 704 P.2d 989 (1985), turned on application of the second *Southwestern Bell* factor. 10 Kan. App. 2d at 530-31. The court found the amended tariff which was the subject of appeal "dealt only with new rates" and "[t]he Commission's hearing on the tariff likewise dealt only with rates and revenues." 10 Kan. App. 2d at 531. The court concluded this was a rate hearing, and the resulting order was one " 'arising from a rate hearing.' " 10 Kan. App. 2d at 531.

In this case the KCC issued an order to KG&E to show cause why it should be allowed to retain in excess of six million dollars of excess costs charged to Kansas ratepayers during unscheduled outage periods associated with the second refueling of the Wolf Creek Generating Station. As part of the original Wolf Creek rate hearings, the KCC approved an ECA clause as part of KG&E's tariffs. The clause, as explained by KG&E's Supervisor of Regulatory Accounting, is a "rate setting mechanism whereby customers are charged, as a separate component on their bills, for the estimated costs of fuel and purchased power required to meet anticipated energy consumption on KG&E's system during each calendar month." In calculating the proposed refund for purposes of the show cause order, the KCC staff employed an alternative fuel mix ratio, a decision challenged by KG&E, which contended before the KCC and now on appeal that a refund, if ordered, should be calculated under the ECA clause approved as part of the Wolf Creek rate hearings. KG&E argues the rejection of the ECA clause and the application of a different cost adjustment formula resulted in retroactive ratemaking in the instant case.

We find that, based on either *Southwestern Bell* factor, the close relationship between this case and the prior rate case, or the similarity of the involved tariff to a rate schedule, jurisdiction properly lies with this court because the show cause order in this case is inextricably bound to the tariffs established in the prior rate case and the issues involved are not simply ones of tariff interpretation. Likewise, KG&E's ECA clause is an indispensable component of its rate structure because it is the only

mechanism available to KG&E to price its product for the purposes of recovering its fuel costs. Even if the ECA clause in this case is a tariff, it is a tariff similar to a rate schedule.

Our scope of review is defined at K.S.A. 77-621, a codification of principles well established in Kansas case law. See *Zinke & Trumbo, Ltd. v. Kansas Corporation Comm'n,* 242 Kan. 470, 474, 749 P.2d 21 (1988); *Kansas Gas & Electric Co. v. Kansas Corporation Comm'n,* 239 Kan. 483, 497, 720 P.2d 1063 (1986). An explanation of those principles appears in *Midwest Gas Users Ass'n v. Kansas Corporation Commission,* 3 Kan. App. 2d 376, 380-81, 595 P.2d 735, *rev. denied* 226 Kan. 792 (1979).

"An order is 'lawful' if it is within the statutory authority of the commission, and if the prescribed statutory and procedural rules are followed in making the order. *Central Kansas Power Co. v. State Corporation Commission,* 221 Kan. 505, Syl. ¶ 1, 561 P.2d 779 (1977). An order is generally considered 'reasonable' if it is based on substantial competent evidence. *Jones v. Kansas Gas and Electric Co.,* 222 Kan. 390, Syl. ¶ 2 [, 565 P.2d 597 (1977)].

"The legislature has vested the commission with wide discretion and its findings have a presumption of validity on review. *Central Kansas Power Co. v. State Corporation Commission,* 221 Kan. at 511. Since discretionary authority has been delegated to the commission, not to the courts, the power of review does not give the courts authority to substitute their judgment for that of the commission. *Central Kansas Power Co. v. State Corporation Commission,* 206 Kan. 670, 675, 482 P.2d 1 (1971). The commission's decisions involve the difficult problems of policy, accounting, economics and other special knowledge that go into fixing utility rates. It is aided by a staff of assistants with experience as statisticians, accountants and engineers, while courts have no comparable facilities for making the necessary determinations. *Southwestern Bell Tel. Co. v. State Corporation Commission,* 192 Kan. 39, 48-9, 386 P.2d 515 (1963). Hence a court may not set aside an order of the commission merely on the ground that it would have arrived at a different conclusion had it been the trier of fact. It is only when the commission's determination is so wide of the mark as to be outside the realm of fair debate that the court may nullify it. *Kansas-Nebraska Natural Gas Co. v. State Corporation Commission,* 217 Kan. 604, 617, 538 P.2d 702 (1975); *Graves Truck Line, Inc. v. State Corporation Commission,* 215 Kan. 565, Syl. ¶ 5, 527 P.2d 1065 (1974)." (Cited with approval in *Kansas Gas & Electric Co. v. Kansas Corporation Comm'n,* 239 Kan. at 496-97, and *MAPCO Intrastate Pipeline Co. v. Kansas Corporation Comm'n,* 10 Kan. App. 2d at 533-34.)

"[S]ubstantial competent evidence is that which possesses something of substance and relevant consequence, and which furnishes a substantial basis of fact from which the issues tendered

can reasonably be resolved." *Southwestern Bell Tel. Co. v. Kansas Corporation Commission,* 4 Kan. App. 2d 44, 46, 602 P.2d 131 (1979), *rev. denied* 227 Kan. 927 (1980).

1. Retroactive Ratemaking.

In determining the amount of refund owed KG&E customers, the KCC based its calculation on actual fuel mix data collected over a three-year period. KG&E contends the only approved alternative fuel ratio is contained in the current ECA clause, and adoption of any other methodology constitutes prohibited retroactive ratemaking. The KCC relies on its statutory authority to prevent collection of unreasonable and unjust rates and claims that it does not have to abide by the terms of the ECA clause alternative fuel ratio for several reasons: (1) the ban against retroactive ratemaking is basically a policy decision; (2) the ECA clause is not a "rate"; (3) the ECA clause is subject to supervision by the KCC and thus can be modified retroactively; and (4) the ECA clause is only applicable to energy costs not within the control of the utility.

While recognizing the KCC's broad authority to regulate rates, we hold that application of an alternative fuel ratio other than that contained in the current ECA clause constitutes prohibited retroactive ratemaking.

K.S.A. 1989 Supp. 66-101d gives the KCC authority to investigate rates either on complaint or on its own initiative. The statute continues, in relevant part: "If after hearing and investigation the commission finds that such rates . . . are unjust, unreasonable, unjustly discriminatory or unduly preferential, the commission shall have the power to fix and order substituted therefor such rates . . . as are just and reasonable."

The KCC's power to set just and reasonable rates, however, is subject to the general rule "that a statute will operate prospectively rather than retrospectively unless its language clearly indicates that the legislature intended the latter, and that retrospective application will not be given where vested rights will be impaired." *Eakes v. Hoffman-LaRoche, Inc.,* 220 Kan. 565, 568, 552 P.2d 998 (1976). There is no clear indication of legislative intent that 66-101d operate retrospectively. On the contrary, such a construction would fly in the face of well-established Kansas precedent against retroactive ratemaking. See, *e.g., Kansas-Ne-*

*braska Natural Gas Co. v. State Corporation Commission,* 217 Kan. 604, 615, 538 P.2d 702 (1975); *State, ex rel., v. Public Service Comm.,* 135 Kan. 491, 504, 11 P.2d 999 (1932); *MAPCO Intrastate Pipeline Co. v. Kansas Corporation Comm'n,* 10 Kan. App. 2d at 533; *Sunflower Pipeline Co. v. Kansas Corporation Commission,* 3 Kan. App. 2d 683, 686, 600 P.2d 794 (1979).

The ban against retroactive ratemaking has a statutory and constitutional basis in Kansas. In *Sunflower Pipeline Co. v. Kansas Corporation Commission,* 5 Kan. App. 2d 715, 624 P.2d 466, *rev. denied* 229 Kan. 671 (1981), a utility was ordered to refund to customers all amounts collected over the approved rates. The court concluded K.S.A. 66-109 does not allow deviation from an established rate without commission approval, even if the established rate is unreasonably low. The court further concluded, "[P]artial refunds would amount to retroactive ratemaking by the commission." 5 Kan. App. 2d at 722. Nor, by analogy, could the KCC deviate from the established rate, as it did in this case, because it determined the weighted three-year average more accurately reflected KG&E's actual fuel mix than the alternative fuel mix ratio in the ECA clause.

In *State, ex rel., v. Public Service Comm.,* 135 Kan. 491, the court found a statute that authorized retroactive reparation of certain freight rates constitutionally infirm. Focusing on the vested rights of private litigants, the court stated:

"[W]hen a rate has been the subject of a deliberate inquiry in which the carriers, the shippers and the commission's own experts have participated, . . . any rate so prescribed by the commission and put into effect by the carriers may be confidently collected and retained by them . . ., without misgiving that at some future time a further hearing of the commission may be had and more evidence taken and a different conclusion reached, and those rates condemned as unreasonable . . . . Such a method of regulating public utilities has none of the earmarks of due process of law nor the simplest notions of justice." 135 Kan. at 504.

In Kansas, the ban against retroactive ratemaking is more than a matter of policy. The KCC cannot retroactively deprive a utility of its lawfully established rates.

The KCC further contends it has not violated the prohibition against retroactive ratemaking because the ECA clause is not a

rate. This contention draws a sharper distinction between tariffs and rates than we have discerned in the case law.

"Tariffs have been defined as 'those terms and conditions which govern the relationship between the utility and its customers.' [Citation omitted.] A rate schedule involves 'pricing the product to particular classes of customers to permit the utility to recover the revenue to which it is entitled.' [Citation omitted.] A tariff is thus broader than a rate schedule and can include terms beyond the mere pricing of the product. [Citation omitted.]" *In re Application of Southwestern Bell Tel. Co.*, 9 Kan. App. 2d at 530-31.

Tariffs, while distinguishable from rates in some particulars, share common characteristics with rate schedules. KG&E's ECA clause, as part of the company's tariff filings pursuant to the Wolf Creek rate order, operates as a pricing mechanism. It has been found that "[t]ariffs duly filed . . . generally bind both the utility and the customer. [Citation omitted.] Tariffs filed with regulatory agencies must comport with any conditions, schedules and provisions authorized by the agency and amended tariffs and schedules of rates are not effective unless approved by the KCC. [Citation omitted.]" *Southwestern Bell Tel. Co. v. Kansas Corporation Commission*, 233 Kan. 375, 377, 664 P.2d 798 (1983).

Tariffs are encompassed within the prohibition against retroactive ratemaking, particularly when, as in the present case, they share similarities with rate schedules.

A closer examination of the ECA clause buttresses our conclusion that retroactive ratemaking occurred when the KCC applied an alternative fuel mix ratio other than that in the tariff.

In 1977, on its own motion, the KCC initiated an investigation to establish general policies with regard to purchased natural gas, fuel for electric power generation, and purchased electric power. Docket No. 106,850-U. The resulting order adopted a uniform clause which designates variable automatic adjustment provisions to permit the pass-through of actual costs of gas, fuel, or purchased power.

The KCC stated at page 11 of the 1977 order in that docket:

"We are cognizant that one of the dangers of a variable clause is that even costs that are avoidable, will be passed on to the consumer. No matter how ineffective the utility's purchasing or operating performance is, the consumer will be asked to bear the cost. While we believe that a variable clause is by far the most desirable mechanism for passing through changes in the cost of gas, fuel and purchased power, the Commission also recognizes

that it must reserve the right to suspend or adjust the clause if the results of its application fall outside the prescribed limits."

The KCC required utilities to submit a monthly report relative to charges under the ECA clause on or before the 15th of the month prior to the month for which the energy adjustment was to be billed. The KCC retained jurisdiction to suspend the ECA clause by notifying the utility on or before the 25th of the month prior to the month for which the adjustment was to be billed.

As part of the Wolf Creek rate order in 1985, KG&E's ECA clause was revised. The relevant nuclear fuel mix limits were set at 0-45% with the nuclear alternative fuel ratio set at 21%. Recognizing the insufficiency of the evidence on which those limits were established, the KCC stated in the Wolf Creek order: "We . . . intend to treat ECA tariffs filed in compliance with this order as temporary and to set the matter for hearing subsequently." No hearing was subsequently scheduled to revise the tariffs, possibly as noted by James Haines, director of the Wolf Creek Nuclear Operating Corporation (WCNOC), because Wolf Creek performance has consistently exceeded expectation.

It was impossible for Wolf Creek to fall below its minimum fuel limit, which was set at 0%, and the generating station exceeded its 45% maximum limit 61% of the time. Theoretically, KG&E could have reaped a windfall had the 21% alternative ratio been employed when Wolf Creek exceeded the upper limits because, according to the record before us, nuclear power is KG&E's least expensive fuel source. The KCC's staff has, in each instance, recommended recovery of actual fuel settlement costs rather than use of the alternate ratio, resulting in considerable savings to KG&E customers.

Given Wolf Creek's performance history, the ECA clause limits appear to be overdue for revision. In the Wolf Creek hearing, the plant's capacity factor was estimated at 61%; whereas, the actual cumulative factor since start-up in 1985 is 69.9%. KG&E witness Ernest Lehman testified in the current hearing that the minimum nuclear fuel mix limit was set at 0% in recognition that the plant would be off-line for refueling. The 45% maximum was chosen because it was expected Wolf Creek could produce no more than 45% of KG&E's energy requirements in the lowest load months. The 21% alternative fuel ratio recognized Wolf

Creek's expected capacity on start-up. In the four months of commercial operation in 1985, Wolf Creek operated at 90.6% capacity and in 1986, its first full year of operation, it operated at 70.4%.

The KCC, in the current order, has now directed its staff to "commence an investigation reviewing KG&E's current ECA and Alternative Fuel Mix limits with a view toward determining accurate and appropriate figures."

Two statements printed on the ECA clause itself are particularly relevant to our inquiry. In fine print on the first page, it is stated: "No supplement or separate understanding shall modify the tariff as shown hereon." Perhaps more relevant, under the heading "Commission and other Approval" on page three, it is stated:

"The rates and any terms or conditions provided herein are subject to changes or substitutions, either in whole or in part, made from time to time by a legally effective filing of the Company with, or by order of, the regulatory authority having jurisdiction, and the Company reserves the right to seek unilaterally changes or substitutions, in accordance with law, from such regulatory authority."

In summary, the original order establishing the ECA clause provided the KCC could suspend the clause by notifying the utility on or before the 25th of the month prior to the month for which the adjustment was to be billed. The tariff itself provides it is subject to change by order of the KCC. The tariff has been in unchanged continuous use since 1985, although the KCC acknowledged the need to examine Wolf Creek operational data. We conclude that the KCC and the utility were bound by the provisions of the tariff until changed by further order of the KCC.

We find no evidence in the record that the ECA clause is applicable only to unavoidable costs. In adopting the ECA clause, the KCC acknowledged the danger inherent in such clauses of passing on avoidable costs to the consumer. As a result, the KCC incorporated into the ECA clause the safeguard of review prior to billing and the right to suspend the ECA clause prospectively. In addition, the KCC adopted alternative fuel ratios to be employed when the utility's performance falls outside the stated limits. Testimony of James M. Proctor, KCC chief utility regulatory auditor, is consistent with application of the ECA clause to both avoidable and unavoidable costs. Proctor stated that

"when Staff believes the limits were exceeded for avoidable reasons it may recommend that fuel costs determined using the alternate ratios be recovered." The KCC's staff did not exercise that option during the 1987-88 outages.

A refund, if warranted, should have been calculated under existing tariffs. This conclusion in no way diminishes or infringes upon the powers of the KCC, which are admittedly expansive. It does, however, assure that " '[a] rate once fixed remains established until changed in some manner allowed by law.' " *Sunflower Pipeline Co. v. Kansas Corporation Commission*, 5 Kan. App. 2d at 720.

Because on remand a reasonableness determination under the ECA clause will necessarily involve an examination of imprudence, we will address issues of admission of expert testimony and sufficiency of the evidence to support the imprudence finding.

2. Admission of Expert Testimony

KG&E contends staff witness David A. Schlissel lacked qualifications to give expert testimony on matters pertaining to nuclear power plants. In particular, KG&E contends Schlissel had no basis to give testimony on the prudence of management actions or the. impact of imprudence on the outage duration. KG&E, therefore, contends the KCC erred in admitting Schlissel's testimony.

"The rules of evidence as found in the Kansas Code of Civil Procedure are to be applied by the KCC at all of its hearings. The chairman may, however, relax the rules of evidence when 'it will be in the public interest to do so and will aid in ascertaining the facts.' K.A.R. 82-1-230." *In re Application of Southwestern Bell Tel. Co.*, 9 Kan. App. 2d at 539.

As guidance to the KCC, K.S.A. 60-456(b) provides:

"If the witness is testifying as an expert, testimony of the witness in the form of opinions or inferences is limited to such opinions as the judge finds are (1) based on facts or data perceived by or personally known or made known to the witness at the hearing and (2) within the scope of the special knowledge, skill, experience or training possessed by the witness."

Admission of expert testimony lies within the trial court's discretion, *Hampton v. State Highway Commission*, 209 Kan. 565, 582, 498 P.2d 236 (1972), and within the KCC's discretion in hearings before that body.

Schlissel's educational background includes a bachelor of science degree in engineering from the Massachusetts Institute of Technology (MIT), a master of science degree in engineering from the Stanford University School of Engineering, a law degree from Stanford, and three years of study in nuclear engineering at MIT.

In 1983, Schlissel formed Schlissel Engineering Associates and has been retained by governmental bodies, municipal utility systems, and private organizations in seventeen states to prepare expert testimony and analyses on engineering and economic issues related to public utilities. He reviewed a list of recent clients and listed regulatory commissions in twelve states before whom he had testified in addition to the Atomic Safety and Licensing Board of the Nuclear Regulatory Commission. Although the weight of Schlissel's testimony was subject to attack because he lacked actual practical experience in the nuclear field, this conclusion does not erode the propriety of the KCC's initial ruling to allow his testimony. The KCC did not abuse its discretion in admitting Schlissel's expert testimony.

3. The Imprudence Finding

KG&E contends there is not substantial competent evidence in the record to support the KCC's findings that 78 days of the 1987-88 extended outages were imprudently incurred. KG&E's principal concern is KCC's reliance on the direct testimony of David Schlissel.

Once testimony is admitted, the KCC has discretion to weigh and accept or reject that testimony. *Union Gas System, Inc. v. Kansas Corporation Commission*, 8 Kan. App. 2d 583, 586-87, 663 P.2d 304, *rev. denied* 233 Kan. 1093 (1983) (cited with approval in *MAPCO Intrastate Pipeline Co. v. Kansas Corporation Comm'n*, 10 Kan. App. 2d at 532). Although Schlissel's credibility was undermined on cross-examination, he presented cogent direct testimony which the KCC accepted. We find no abuse of discretion in the KCC's acceptance of Schlissel's testimony.

We turn now to the question of the sufficiency of the evidence to support the KCC's findings.

As a preliminary matter, we note KG&E's contentions that it has been held to a standard of strict liability rather than prudence and that the KCC focused on too narrow a time frame in judging its performance. Our review of the record reveals a prudence

standard was applied, although one might disagree with the KCC's conclusions as KG&E does. In his direct testimony, Schlissel defined the prudence standard as "how reasonable persons, with the skill and knowledge attributed to reasonable utility managers, should have been expected to cope with the circumstances and problems." *Cf. Kansas Gas & Electric Co. v. Kansas Corporation Comm'n*, 239 Kan. at 495 ("prudence" defined as " '[c]arefulness, precaution, attentiveness and good judgment' ").

As to KG&E's complaint that the KCC too narrowly focused on performance during the outage periods of 1987-88 rather than taking a larger view of performance since the beginning of commercial operation in 1985, conflicting evidence exists. The record is replete with KG&E testimony detailing Wolf Creek's superior performance and admonitions that the KCC should measure performance over a statistically significant period of time. There is, however, also testimony in the record from Fred B. Adam, who testified on behalf of the industrial intervenors that, if performance were measured over an extended period of time, KG&E could recover costs despite inefficiency and imprudence. Focus on the narrower time frame was not arbitrary and capricious.

KG&E originally scheduled this second refueling outage to last 56 days but later developed a 49-day work schedule to begin September 30, 1987. The outage began prematurely on September 27, 1987, when workers inadvertently tripped a switch which forced the shut-down of the plant. The refueling outage lasted 101 days with the plant back on line January 5, 1988. A 26-day unscheduled outage began on January 21, 1988, 21.5 days of which were attributable to a leak past the reactor vessel "O" rings and a 4.5-day extension attributed to a ground in the main generator exciter rotor. The plant returned to power on February 17, 1988, having been out of service 127 days between September 27, 1987, and February 17, 1988.

Staff witness David Schlissel found between 44 and 52 of the unscheduled outage days during refueling were the result of WCNOC's failure to properly plan, manage, and control outage activities. Schlissel concluded WCNOC could have avoided the entire 26-day forced outage had the "O" ring gasket area been subjected to a second inspection before start-up after refueling.

KG&E does not contend there is no evidence in Schlissel's direct testimony to support the KCC's decision. KG&E's contention, rather, is that Schlissel's credibility was so impaired on cross-examination that his testimony as a whole does not constitute substantial competent evidence. Admittedly, Schlissel's credibility was impaired by references to deficiencies in his experience (as opposed to education). He admitted the 49-day schedule was an aggressive one, but he continued to maintain the work could have been done in that time or the problems *could have been anticipated.* Because there are varying explanations for each event, it is difficult to say there is not a substantial basis of fact from which the issues can be resolved.

The "O" ring incident is a case in point. KG&E witnesses testified the specific problem was unknown to the industry before the Wolf Creek incident. On the other hand, there is testimony the "O" ring leak was discovered on December 26, 1987, and yet management continued to bring the plant back on line. There was general knowledge that the industry was having problems with "O" ring seals. Schlissel's testimony was that prudent operators would have performed a second inspection and cleaned the "O" ring gasket area before the vessel head was tensioned or, in the alternative, would have discontinued start-up when the leak was discovered. Evaluating the efficacy of these options appears to be a task particularly within the KCC's expertise.

We share the sentiment of the KCC chairman in his dissent that it is incredible that every single day of outage beyond the 49 days scheduled was due to KG&E's imprudence. However, given the KCC's discretion to weigh testimony and this court's narrow scope of review, we find substantial competent evidence exists of record to support the finding that 78 days of the 1987-88 outages were imprudently incurred.

4. Interest on Refund

KG&E contends the KCC exceeded its statutory authority in ordering 9.8836% interest on the refund of $6,923,457. Although the amount of refund will change, whether to assess interest and the rate to be assessed remain viable issues.

We conclude the KCC has the inherent power under K.S.A. 66-101 to impose interest on refunds when, as here, the refund is ordered for imprudent or unreasonable actions. K.S.A. 66-101

gives the KCC "full power, authority and jurisdiction to supervise and control the electric public utilities . . . doing business in Kansas, and is empowered to do all things necessary and convenient for the exercise of such power, authority and jurisdiction."

K.S.A. 66-101g further provides:

"As applied to regulation of electric public utilities, the provisions of this act and all grants of power, authority and jurisdiction herein made to the commission, shall be liberally construed, and all incidental powers necessary to carry into effect the provisions of this act are expressly granted to and conferred upon the commission."

We question the imposition of interest different than the statutory rate, however, absent any authorizing agreement, statute, or regulation. See K.S.A. 16-204(e).

If, on remand, a refund is ordered under the ECA clause alternative fuel ratio, we hold the KCC has inherent authority to impose the statutory rate of interest on that refund.

Given our disposition of the refund issue, we need not address the issues of the industrial intervenors other than to note the KCC's order should identify the customers entitled to the refund and how the refund should be apportioned, as well as the manner and time of payment.

That portion of the KCC's order mandating a $6.9 million refund with interest is reversed. The case is remanded for consideration of whether, during the months when fuel limits were exceeded, the actions of KG&E were reasonable and, if found to be unreasonable, for proper application of the ECA clause. In short, although we have affirmed the KCC's finding of imprudence, it will still be necessary on remand to determine reasonableness under the ECA clause.