(685 P.2d 304)

No. 56,717

In the Matter of the Application of Southwestern Bell Telephone Company.
Petition for review denied October 2, 1984.

Opinion filed June 18, 1984.

*George E. Erickson, Jr.*, of Topeka, and *Thomas H.W. Sawyer*, general attorney, for the applicant AT&T Information Systems, Inc.

*Lawrence A. Dimmitt* and *Michael C. Cavell,* of Topeka, for the respondent Southwestern Bell Telephone Company.

*Eva Powers,* assistant general counsel, and *Brian J. Moline,* general counsel, for the respondent Kansas Corporation Commission.

Before ABBOTT, P.J., REES and BRISCOE, JJ.

BRISCOE, J.: Southwestern Bell (SWB) filed a tariff application with the Kansas Corporation Commission (KCC) on October 27, 1983. The proposed tariff would enable SWB to recover its capital investment in embedded complex inside wire. American Telephone and Telegraph Information Systems (ATT-IS) intervened in the tariff proceeding and now seeks review of the KCC order approving the tariff.

Years of negotiations and litigation between the United States on one side and Western Electric Company, Inc., and American Telephone and Telegraph Company (AT&T) on the other, led to district court approval of a consent decree in 1982 which required AT&T to divest from itself the 22 Bell Operating Companies (BOC). See *United States v. American Tel. and Tel. Co.,* 552 F. Supp. 131, 135-140 (D.D.C. 1982), *aff'd sub nom, Maryland v. United States,* 460 U.S. 1001, 75 L.Ed.2d 472, 103 S.Ct. 1240 (1983). For purposes of this case, it is only necessary to understand that two lawsuits were involved. The first, filed in the United States District Court for the District of New Jersey in 1949, resulted in a 1956 consent decree which did not include divestiture or other structural changes. A second antitrust action was filed in the United States District Court for the District of Columbia in 1974, and, in 1982, a consent decree was proposed. This consent decree is referred to as the Modification of Final Judgment (MFJ), which references the 1956 consent decree, although the two decrees have little in common. The New Jersey case was then consolidated with the action in the District of Columbia for court approval of the consent decree.

In *United States v. American Tel. and Tel. Co.,* 552 F. Supp. 131, the parties were ordered to submit to the court a modified decree and to submit to the Department of Justice a plan of reorganization (POR). 552 F. Supp. at 226. Subsequently, in *United States v. Western Elec. Co., Inc.,* 569 F. Supp. 1057 (D.D.C. 1983), *summarily aff'd* 52 U.S.L.W. 3450 (U.S. December 13, 1983), the court reviewed the POR previously approved by the Department of Justice (see also *United States v. Western Elec. Co., Inc.,* 569 F. Supp. 990 [D.D.C. 1983]), and

after limited modification the court also approved the POR. Within the POR was provision for the BOC's to retain inside wiring. On subsequent motions for reconsideration and clarification, the court specifically addressed the inside wiring issue.

"Several intervenors ask the Court to reconsider its approval of the assignment of the so-called Account 232 to the Operating Companies and to assign the Account instead to AT&T. That request will likewise be denied. In-place wiring, which is a principal item in Account 232, is as much a 'bottle-neck' as are the subscriber access lines. To assign such wiring to AT&T would be to insert AT&T-controlled facilities between the Operating Companies and the subscribers, and such an assignment would thus be entirely inconsistent with the basic purposes of the decree.

"Account 232 also includes the capitalized labor costs associated with the installation and testing of customer premises equipment, and a theoretical case could be made that, since under the plan embedded CPE is being assigned to AT&T, so should be this portion of Account 232. However, the Court was and is persuaded by AT&T's argument, for the reasons stated in AT&T's Response to Objections at 154-55, that there is no practical way to separate out the various handling costs. The provision made in the plan of reorganization regarding Account 232 is consistent with the decree and otherwise reasonable, and there is no basis for reconsidering the Court's approval of the plan in this regard." 569 F. Supp. at 1129.

Thus, at the time of divestiture on January 1, 1984, AT&T owned the complex Customer Premises Equipment (CPE) and the local BOC's owned the embedded complex inside wire (CIW), as well as the capitalized investment associated with its installation in years prior to 1981.

Customer Premises Equipment (CPE) is defined for purposes of the MFJ as "equipment employed on the premises of a person (other than a carrier) to originate, route, or terminate telecommunications, but does not include equipment used to multiplex, maintain or terminate access lines." 552 F. Supp. at 228.

Embedded Complex Inside Wire (CIW) as defined in the course of these proceedings is "wire which connects stations to switching or common equipment used in complex terminal equipment arrangements such as key telephone and private branch exchange (PBX) systems." The attorney for SWB offered a more graphic description of the CIW as "the transmission path for the communications from the mouthpiece of the talker into the eventual network for completion over the public network itself."

The problem lies in SWB's recovery of its investment in CIW prior to 1981 when SWB was required by federal regulation to

capitalize its investment in CIW. In 1981, under FCC direction, SWB began expensing CIW costs in the year incurred. The capitalized investment from prior years, Account 232, was to be amortized over a ten-year period, ending in 1991. This translates to a depreciating base of investment requirement of $5,742,000 annually in Kansas, currently recovered by station line charges. The tariff amount is less, $5,657,635, because SWB will no longer perform maintenance. After divestiture, SWB will no longer have station line information; therefore, the sum must be collected in another manner.

SWB's solution in Kansas was a General Exchange Tariff Application filed October 27, 1983, which proposes billing owners of CPE who use CIW at a rate per access line. The significant changes are from customer billing to owner billing and from charges based on number of station lines to number of access lines. AT&T and ATT-IS petitioned and were granted permission to intervene.

At a hearing before the KCC, the parties outlined their positions.

Because SWB will no longer have station line information after divestiture, SWB proposed billing owners of CPE who use CIW at a rate of $5.60 per access line. Existing CPE was transferred to AT&T on January 1, 1984, so the "owner" for all practical purposes is ATT-IS. Other vendors could also be "owners" and ATT-IS could sell its CPE. According to SWB, the CPE owner should be billed because the CIW is an integral part of that system.

SWB briefly presented two other alternatives: (1) the Mountain Bell Plan where customers continue to be billed directly on the basis of the number of station lines in existence on December 31, 1983, with the disadvantage of a potential revenue shortfall; and (2) the amortization of Account 232 over the general body of ratepayers, an alternative adopted in Texas.

ATT-IS objected to the undue burden on small customers, unnecessary administrative costs, and increased overhead for ATT-IS, which ATT-IS contends is inherent in the SWB tariff proposal.

ATT-IS offered as alternatives: (1) the Texas proposal of absorbing these costs as part of the overall rate structure, (2) access line charges imposed directly on customers, and (3) the Moun-

tain Bell Plan of billing customers on station line charges fixed on a certain date. ATT-IS characterized the Mountain Bell Plan as least disruptive in Kansas because station line charges are currently being made, but did acknowledge that any shortfall becomes part of SWB's general revenue requirement.

A consultant to the KCC staff proposed the three alternatives offered by ATT-IS as well as a fourth, no recovery of this revenue by SWB. Administrative costs and disparity in billing were cited as the primary disadvantages of SWB's tariff proposal. The consultant's position was that direct customer billing by SWB was most economical and the Mountain Bell alternative constituted a reasonable plan. He acknowledged that if customers left the system, a revenue shortfall would occur, but that the plan has the advantage of continued KCC regulation.

On December 30, 1983, the KCC entered its order approving the proposed tariff. ATT-IS applied for rehearing, raising numerous issues. The KCC allowed oral argument on the application before denying it on February 20, 1984. ATT-IS timely perfected appeal to this court. SWB has been permitted to intervene on appeal.

Before proceeding to the issues, we must first determine whether this court has jurisdiction of this tariff case. K.S.A. 66-118a states in pertinent part:

"The court of appeals shall have exclusive jurisdiction of proceedings for review of an order or decision of the state corporation commission *arising from a rate hearing* requested by a public utility or requested by the state corporation commission when a public utility is a necessary party. Proceedings for review of other orders or decisions of the state corporation commission shall be to a district court having venue, as provided in K.S.A. 66-118c." Emphasis added.

The jurisdictional issue before us is whether this tariff action is one "arising from a rate hearing," thus conferring jurisdiction on this court under K.S.A. 66-118a. Two factors compel our conclusion that jurisdiction lies with this court: (1) the close relationship between this case and the prior rate case; and (2) the similarity of the involved tariff to a rate schedule.

In Commission Docket 137,534-U, the KCC granted SWB a $97.6 million general rate increase on December 23, 1983. Included in that amount is $5.6 million to be recouped by SWB for its investment in CIW. How the $5.6 million in revenue would be collected was not determined in the rate case, but was instead set over to another docket, Commission Docket 83- U-315,

which is the tariff case before us. As a result of divestiture, the KCC needed to quickly resolve the underlying rate case and separate treatment of the tariff was thought to be more expeditious. The KCC subsequently entered its order approving SWB's tariff on December 30, 1983.

As the cost of CIW was part of the revenue requirement approved in the rate case, the tariff approval was directly related to the rate hearing. The manner of implementation of the previously approved rate was the only matter addressed in the tariff case, clearly establishing the ruling in the tariff case as a ruling "arising from a rate hearing" under K.S.A. 66-118a.

This case is also analogous to *Sunflower Pipeline Co. v. Kansas Corporation Commission,* 3 Kan. App. 2d 683, 600 P.2d 794 (1979), where this court assumed jurisdiction after concluding "[t]ariff approval is a concomitant part of a rate increase procedure." 3 Kan. App. 2d at 686. In *Sunflower Pipeline,* a KCC order of August 25, 1978, granted a rate increase. After Sunflower subsequently filed its proposed tariffs, a dispute arose as to the effective date of the tariffs. An appeal was taken to this court from a second KCC order which held the rate increase was not effective until November 1, 1978. In addressing the KCC's authority to approve tariffs, the court described the relationship between rates and tariffs as follows:

"[I]t is reasonable that along with the authority to grant rate increases goes the power to approve the correctness of the tariffs proposed by the utilities to carry out the orders of the KCC. As a result, a rate increase authorized by the KCC will not be effective until the proposed tariffs have been both filed with and approved by the KCC." 3 Kan. App. 2d at 686.

*Sunflower Pipeline* provides support for recognition of a KCC ruling on a tariff application as "arising from a rate hearing." Here, the rate-tariff relationship is even closer, and only the unusual circumstances resulting from divestiture caused the severance of the tariff issues from the initial rate case.

The similarity of this tariff to a rate schedule also weighs favorably for our assumption of jurisdiction. Tariffs have been defined as "those terms and conditions which govern the relationship between the utility and its customers." *Southwestern Bell Tel. Co. v. Kansas Corporation Commission,* 233 Kan. 375, 377, 664 P.2d 798 (1983). A rate schedule involves "pricing the product to particular classes of customers to permit the utility to

recover the revenue to which it is entitled." *Midwest Gas Users Ass'n v. Kansas Corporation Commission,* 5 Kan. App. 2d 653, Syl. ¶ 1, 623 P.2d 924, *rev. denied* 229 Kan. 670 (1981). A tariff is thus broader than a rate schedule and can include terms beyond the mere pricing of the product. See, *e.g., Burdick v. Southwestern Bell Tel. Co.,* 9 Kan. App. 2d 182, 675 P.2d 922 (1984) (tariff provisions regulating interruption of telephone service).

The tariff in issue is quite similar to a rate schedule, however, for it sets forth how the $5.6 million will be assessed against various classes of SWB customers so that SWB can recover the revenue to which it is entitled. Thus, approval of the tariff by the KCC is analogous to approval of a rate schedule. Cases involving only the validity of a rate schedule, and not the validity of the underlying rate increase, have been appealed directly to this court under K.S.A. 66-118a. *Midwest Gas Users Ass'n v. Kansas Corporation Commission,* 5 Kan. App. 2d 653; *Midwest Gas Users Ass'n v. Kansas Corporation Commission,* 3 Kan. App. 2d 376, 595 P.2d 735, *rev. denied* 226 Kan. 792 (1979).

The conclusion that this court has jurisdiction in this case does not mean that all cases involving tariffs are directly appealable to this court under K.S.A. 66-118a. For example, questions of tariff interpretation should be appealed to the district court. *Southwestern Bell Tel. Co. v. Kansas Corporation Commission,* 233 Kan. 375. If the tariff is closely related to a prior rate case or if it is similar to a rate schedule, jurisdiction will more likely be with this court than with the district court.

The appellate scope of review of orders or decisions of the KCC is limited to a determination of whether such orders or decisions are lawful and reasonable. K.S.A. 66-118d. See, *e.g., Southwestern Bell Tel. Co. v. Kansas Corporation Commission,* 233 Kan. at 376; *Kansas Gas & Electric Co. v. State Corporation Commission,* 218 Kan. 670, Syl. ¶ 1, 544 P.2d 1396 (1976). This standard of review was further explained in *Midwest Gas Users Ass'n v. Kansas Corporation Commission,* 3 Kan. App. 2d at 380-81; cited very recently with approval by our Supreme Court in *Kansas Electric Power Coop., Inc. v. Kansas Corporation Comm'n,* 235 Kan. 661, 683 P.2d 1235 (1984); and followed in *Union Gas System, Inc. v. Kansas Corporation Commission,* 8 Kan. App. 2d 583, 585-86, 663 P.2d 304, *rev. denied* 233 Kan.

1093 (1983); and *Ash Grove Cement Co. v. Kansas Corporation Commission,* 8 Kan. App. 2d 128, 130, 650 P.2d 747 (1982):

"A court has no power to set aside such an order unless it finds that the commission acted unlawfully or unreasonably. [Citation omitted.] An order is 'lawful' if it is within the statutory authority of the commission, and if the prescribed statutory and procedural rules are followed in making the order. [Citation omitted.] An order is generally considered 'reasonable' if it is based on substantial competent evidence. [Citation omitted.]

"The legislature has vested the commission with wide discretion and its findings have a presumption of validity on review. [Citation omitted.] Since discretionary authority has been delegated to the commission, not to the courts, the power of review does not give the courts authority to substitute their judgment for that of the commission. [Citation omitted.] The commission's decisions involve the difficult problems of policy, accounting, economics and other special knowledge that go into fixing utility rates. It is aided by a staff of assistants with experience as statisticians, accountants and engineers, while courts have no comparable facilities for making the necessary determinations. [Citation omitted.] Hence a court may not set aside an order of the commission merely on the ground that it would have arrived at a different conclusion had it been the trier of fact. It is only when the commission's determination is so wide of the mark as to be *outside the realm of fair debate* that the court may nullify it. [Citations omitted.]" Emphasis added. *Midwest,* 3 Kan. App. 2d at 380-81.

Although ATT-IS asserts nine issues, excluding subparts, we have identified four general issues: (I) whether there was substantial evidence to support the KCC order; (II) whether the KCC order conflicts with federal decisions and constitutional provisions; (III) whether the KCC order is discriminatory; and (IV) whether the KCC erred in evidentiary rulings.

I. *Substantial Evidence to Support the KCC Order.*

Central to many of the issues raised by ATT-IS is its contention that the KCC erred by attempting to authorize assessment of charges for utility service against a party who does not use the service. ATT-IS contends it is not a user of the wire; therefore, the KCC cannot lawfully allow SWB. to impose a charge on ATT-IS. An ATT-IS witness, John Smith, addressed this point at the hearing. He testified that "use" of the wire is "by the customer for the transmission of communications." He went on to state: "If it were appropriate for Southwestern Bell to charge ATT-IS for use of wire simply because it was connected to ATT-IS's CPE, then on the same rationale, it would be appropriate for ATT-IS to charge Southwestern Bell for the use of ATT-IS's CPE." This argument seems to miss the point that SWB owns the wire and the ATT-IS CPE will not function without it. The wire is the conduit between the ATT-IS CPE and

SWB's local exchange facility. "Use" does not have the narrow meaning ATT-IS suggests.

In *State v. Howard,* 221 Kan. 51, 53, 557 P.2d 1280 (1976), the court defined the word "use":

"'Use' is a verb of common usage. Ordinarily it means to employ; to avail oneself of; to utilize; to carry out a purpose or action by means of; to put into action or service, especially to attain an end."

The customer's use does not preclude a finding that ATT-IS also uses the wire.

The Oklahoma Corporation Commission, in a decision filed December 29, 1983, approved SWB's plan to charge owners of CPE for use of the wire.

"At divestiture, Southwestern Bell will transfer to AT&T Information Systems (ATT-IS) all embedded customer premises equipment (CPE), including equipment referred to as complex CPE, such as a PBX or key system. However, the inside wiring associated with much of the complex CPE will remain with Southwestern Bell. As a result, Southwestern Bell proposes to charge all CPE vendors who connect CPE to the complex inside wiring. ATT-IS proposes instead that the cost of such service be spread over the general body of ratepayers or charge only the customers of the CPE vendors who make use of the inside wiring.

"From the evidence presented in this cause, it is clear that ATT-IS or any other CPE vendor may avoid the proposed charges simply by installing its own inside wiring or that of another CPE vendor or purchasing the inside wiring from Southwestern Bell. If a CPE vendor instead opts to make use of Southwestern Bell's inside wiring, it clearly receives a direct benefit. In view thereof, we find that Southwestern Bell's proposal is appropriate." *Re Southwestern Bell Teleph. Co.,* 57 Pub. Util. Rep. 4th 627, 640-41 (1983).

ATT-IS is clearly a user of the wire and, therefore, the KCC did not err in authorizing SWB to charge ATT-IS for the use of the wire.

ATT-IS next contends the KCC order constitutes an abdication of the KCC's duty to regulate the manner of recovery of a public utility revenue requirement. A review of the KCC's authority, its exercise here of that authority, and the necessity of its continued exercise of that authority on the issues presented, prove ATT-IS's contention to be without merit.

The legislative grant of authority to the KCC is contained in K.S.A. 1983 Supp. 66-101, which provides in relevant part:

"(a) The state corporation commission is given full power, authority and jurisdiction to supervise and control the public utilities . . . and is empowered to do all things necessary and convenient for the exercise of such power, authority and jurisdiction."

Within that authority lies control over rates and tariffs. See K.S.A. 66-107 through -111.

In this case, the KCC has exercised that power by authorizing SWB to charge a specified sum for use of its wire. ATT-IS's argument arises from the fact that, in this instance, the KCC cannot control the charge eventually levied against the lessee of the CPE. That would appear to be true of any commercial customer who would have to pass telephone charges along to consumers as part of the cost of doing business. It does not appear to diminish the KCC's control over the regulated entity, SWB. To the contrary, this charge was approved only for 1984, forcing SWB to seek KCC approval of this or an alternative plan for 1985 and beyond.

ATT-IS argues the wire tariff contravenes the basic principle of ratemaking—that costs must be assessed against the cost causer. ATT-IS points out that it was not in existence when CIW installation costs were incurred and thus cannot be charged for them, citing *Jones v. Kansas Gas and Electric Company*, 222 Kan. 390. However, *Jones* is distinguishable from the case at bar because it did not address historical costs, but rather stands for the proposition that one class of customers cannot be charged for costs caused by another class of customers.

ATT-IS follows this argument with contentions that the wire tariff will create waste, inefficiency, and degradation of telecommunications service and that the wire tariff will create increased administrative charges to the CPE customer which would be avoided by a more rational plan. These contentions are no more than arguments for a plan different than the one adopted by the KCC. ATT-IS presents a worst case scenario of abandonment of SWB wire, resulting in a smaller pool of users to meet the revenue recovery requirement. These are speculative considerations which do not make adoption of the plan in the current year unreasonable.

All parties acknowledge that increased administrative costs are likely to occur. Those costs imposed on users of the wire do not appear unreasonable, however, in light of alternatives presented to the KCC which would have spread the recovery or at least revenue shortfalls over the general body of ratepayers, most of whom derive no benefit from CIW.

ATT-IS challenges the sufficiency of the KCC's findings of fact to support the order. K.A.R. 82-1-232 provides in relevant part:

"Formal orders of the state corporation commission shall conform in substance to the following rules: (a) . . . .

. . . .

"(3) The order shall contain a concise and specific statement of the relevant law and basic facts which persuade the commission in arriving at its decision."

This court in *Ash Grove Cement Co. v. Kansas Corporation Commission*, 8 Kan. App. 2d 128, discussed the purpose of these findings of fact, noting however that "findings do not have to be stated with such particularity as to amount to a summation of all the evidence. *Central Kansas Power Co. v. State Corporation Commission*, 206 Kan. 670, 677, 482 P.2d 1 (1971)." 8 Kan. App. 2d at 133.

"The purpose of findings of fact as mandated by K.A.R. 82-1-232 (a)(3) is to facilitate judicial review and to avoid unwarranted judicial intrusion into administrative functions. The Commission must, therefore, express the basic facts upon which it relied with sufficient specificity to convey to the parties, and to the courts, an adequate statement of facts which persuaded the Commission to arrive at its decision. [Citations omitted.]" *Ash Grove*, 8 Kan. App. 2d at 132.

In its order, the KCC reviews the effect of divestiture on CPE and CIW, noting the controversy in federal district court over separating those assets. The KCC then reviews SWB's current billing system, the proposed billing system, and ATT-IS's objections to it. The KCC also reviews the alternative billing systems explored and explains its reasons for rejecting them. Essentially, the KCC rejected any plan to charge customers who no longer use the wire or to recover the revenue from the general body of ratepayers. The KCC specifically found that ATT-IS uses the wire and benefits from it. The evidence presented substantiates this determination. The KCC's findings of fact are sufficient to clarify its order.

ATT-IS also focuses on the statement in the KCC's findings that: "We do not find any of the proposals presented to us desirable, particularly not on a long term basis - until 1991." The KCC, therefore, adopted what to it was the most desirable of the proposals offered and limited its application to 1984. This course of action appears within the realm of fair debate. A reviewing court cannot substitute its judgment for that of the KCC if the matter is within the realm of fair debate. See, *e.g., Central Kansas Power Co. v. State Corporation Commission,*

221 Kan. 505, Syl. ¶ 2, 561 P.2d 779 (1977); *Kansas-Nebraska Natural Gas Co. v. State Corporation Commission*, 217 Kan. 604, 617, 538 P.2d 702 (1975); *Cities Service Gas Co. v. State Corporation Commission*, 201 Kan. 223, 234, 440 P.2d 660 (1968); *Southwestern Bell Tel. Co. v. State Corporation Commission*, 192 Kan. 39, 48, 386 P.2d 515 (1963); *Midwest*, 3 Kan. App. 2d at 381.

II. *Conflict with Federal Decisions and Constitutional Provisions.*

ATT-IS contends the KCC order is unconstitutional because it contravenes the supremacy clause of the United States Constitution in that the tariff effects a de facto transfer of wire to ATT-IS in violation of the judgments rendered by the United States District Court for the District of Columbia and by the United States Supreme Court, which require that the complex wire remain an asset of SWB.

As a preliminary matter, both SWB and KCC contend this issue is not properly before the court because ATT-IS has failed to meet the specificity requirement of K.S.A. 66-118b. That statute provides in relevant part:

"No cause of action arising out of any order or decision of the commission shall accrue in any court to any party unless such party shall make application for a rehearing as herein provided. Such application shall set forth specifically the ground or grounds on which the applicant considers such order or decision to be unlawful or unreasonable. No party shall, in any court, urge or rely upon any ground not set forth in said application."

Upon review of the application for rehearing filed by ATT-IS, we conclude that the references made to the supremacy clause in the application are sufficient to apprise KCC and the parties of the supremacy clause argument. The fact that ATT-IS failed to elaborate on this issue, at the hearing on the application for rehearing, does not compel a contrary result. Although K.S.A. 66-118b requires recitation of specific grounds in the application for rehearing as a prerequisite for judicial review, there is no requirement to reassert these issues at argument.

The supremacy clause argument, however, is without merit. The POR assigned CPE to AT&T while assigning CIW to SWB. The district court declined to reconsider that division of assets. *United States v. Western Elec. Co., Inc.*, 569 F. Supp. 990, 1129 (D.D.C. 1983). Despite the lamentations of the SWB witness and the KCC itself as to the wisdom, or lack thereof, in that decision,

clearly the states have no authority to countermand it. *United States v. American Tel. and Tel. Co.*, 552 F. Supp. at 154-156. That is not, however, what the KCC decision purports to do. No purchase is ordered. ATT-IS is being charged for use of CIW. ATT-IS is not the only CPE owner, although it is a major one at the current time. Any owner may avoid the charge by not using SWB's wire.

ATT-IS next contends that the KCC order is unconstitutional because the FCC's report and order in Docket 81-893 preempts any state commission action which would (1) create a de facto transfer of complex wire to ATT-IS, and (2) necessitate ATT-IS's extensive use of restricted customer proprietary information.

Again, as a preliminary matter, SWB and KCC contend this issue is not properly before the court because ATT-IS failed to meet the specificity requirement of K.S.A. 66-118b. ATT-IS states only in its application for rehearing that the KCC order is unlawful and contrary to the order of the FCC. ATT-IS does not state the manner in which the KCC order contravenes FCC Docket 81-893. The general reference to the FCC order could not have put the KCC on notice that the ATT-IS objection went to use of restricted customer proprietary information. The lack of specificity of the application for rehearing bars our consideration of this issue. However, the objection to the de facto transfer of the wire was apparent from the context of the application for rehearing.

Upon review of this contention, we do not find that the order effects a transfer of the wire, de facto or otherwise, to ATT-IS. The KCC order allowing charges for use of the wire applies to 1984 only, and ATT-IS is not the only CPE owner on whom the charges are levied.

ATT-IS also contends that the KCC order confiscates ATT-IS's property in violation of the Fifth and Fourteenth Amendments to the United States Constitution, and § 18 of the Bill of Rights of the Kansas Constitution. Again, SWB and KCC contend these issues are not properly before the court because they are not specifically raised in the application for rehearing as required by K.S.A. 66-118b. We agree. ATT-IS does not assert § 18 of the Bill of Rights of the Kansas Constitution in its application. In addition, references to the Fifth and Fourteenth Amendments to the United States Constitution do not give the KCC and opposing

parties notice of the confiscation argument. Therefore, without prior specific allegation of these issues in the application for rehearing, they cannot be urged at this time. *Peoples Natural Gas v. Kansas Corporation Commission,* 7 Kan. App. 2d 519, 526, 644 P.2d 999, *rev. denied* 231 Kan. 801 (1982).

III. *Discrimination Arguments.*

ATT-IS contends the wire tariff results in disparate treatment of similarly situated parties, creating arbitrary classifications. K.S.A. 66-107 prohibits "unjust or unreasonable discriminatory or unduly preferential" rates. See, *e.g., Southwestern Bell Tel. Co. v. Kansas Corporation Commission,* 233 Kan. at 377; *Milling Co. v. Postal Telegraph Co.,* 101 Kan. 307, 309, 166 Pac. 493 (1917). See also K.S.A. 66-113.

ATT-IS contends the KCC order is discriminatory in two respects: (1) it differentiates between CPE vendors who lease equipment and those who sell it; and (2) its charges, based upon the number of access lines, do not correlate with the amount of wire actually used.

There is no merit to the contention that it is discriminatory to differentiate between CPE vendors who lease equipment and those who sell it. The tariff applies uniformly to all who own equipment. The lessor who owns the equipment is subject to the tariff; when he sells the equipment and ceases to own it, he does not pay the tariff. The result is not discriminatory.

ATT-IS also contends that, among those who own CPE equipment, there is discrimination as a result of this tariff because the amount of wire used does not correlate with the number of access lines. Although ATT-IS phrases this issue as one of customer discrimination, the label is inappropriate for, although the customer may eventually pay the charge, it is initially imposed upon the owner.

There was conflicting testimony regarding the relationship between the number of access lines a customer has and the amount of complex wire used. Dale Kaeshoefer, who testified for SWB, stated there was generally a relationship; John A. Smith, who testified for AT&T, stated there was no consistent relationship. The KCC has discretion to weigh and accept or reject testimony presented to it. *Kansas - Nebraska Natural Gas Co. v. Kansas Corporation Commission,* 4 Kan. App. 2d 674, 676, 610 P.2d 121, *rev. denied* 228 Kan. 806 (1980). The KCC was pre-

sented with conflicting evidence, and this court cannot substitute its judgment for that of the KCC. *Southwestern Bell Tel. Co. v. State Corporation Commission,* 192 Kan. at 48. The KCC order is considered reasonable if based on substantial competent evidence. *Midwest,* 3 Kan. App. 2d at 380. There would not, then, appear to be a viable argument that one 'class has been burdened with costs created by another. *Cf. Jones v. Kansas Gas and Electric Co.,* 222 Kan. 390, 565 P.2d 597 (1977).

IV. *Evidentiary Questions.*

ATT-IS contends the KCC erred in admitting into evidence portions of the prefiled testimony of Dale Kaeshoefer and the exhibits appended to his testimony. This testimony and the accompanying exhibits related to ATT-IS's alleged recommendation of the current SWB proposal. The objections raised by ATT-IS were overruled by the KCC at the hearing. ATT-IS also objected to Kaeshoefer's explanation on cross-examination of SWB's sale of wire to ATT-IS. ATT-IS argued that the explanation was hearsay and unresponsive. That objection was overruled.

The rules of evidence as found in the Kansas Code of Civil Procedure are to be applied by the KCC at all of its hearings. The chairman may, however, relax the rules of evidence when "it will be in the public interest to do so and will aid in ascertaining the facts." K.A.R. 82-1-230. K.S.A. 60-407(f) provides: "[A]ll relevant evidence is admissible." K.S.A. 60-401 defines relevant evidence as "evidence having any tendency in reason to prove any material fact." The reasonableness of SWB's proposal to bill ATT-IS for use of CIW was the central issue at the hearing. Kaeshoefer testified that ATT-IS at one time proposed the SWB plan as an alternative, and correspondence from a SWB executive supported that testimony. Under the Kansas Code of Civil Procedure, this evidence would be admissible over a relevancy objection. Further, the record indicates that John Smith, an ATT-IS witness, had an opportunity to refute this evidence, testifying that alternatives other than recovery from the general body of rate payers came from the BOC central staff.

As stated above, ATT-IS also objected to Kaeshoefer's statement regarding the sale of wire as unresponsive. Kaeshoefer was asked whether SWB would consult with the customer before removing wire ATT-IS does not want to use. Kaeshoefer stated

that he had been told the nature of the transactions by others. The chairman ruled the statement admissible because Kaeshoefer gained the information in the course of his business responsibilities. Although this evidence is objectionable under the Code of Civil Procedure, its admission is harmless in the context of the entire proceeding. Substantial justice was not affected by the admission. K.S.A. 60-261. Furthermore, under K.A.R. 82-1-230, the chairman has some discretion in admission of evidence.

All additional arguments and authorities asserted by ATT-IS, not specifically addressed in this order, have been considered and found to be without merit. We therefore find the tariff order filed by the KCC on December 30, 1983, was lawful because the order was within the statutory authority of the KCC, and the prescribed statutory and procedural rules were followed. We further find the order was reasonable as there was substantial competent evidence to support it.

Judgment is affirmed.