(943 P.2d 494)
No. 78,548
No. 78,822
No. 78,823
No. 78,834

CITIZENS' UTILITY RATEPAYER BOARD, *Appellant*, v. THE STATE CORPORATION COMMISSION OF THE STATE OF KANSAS, *Appellee*.

MULTIMEDIA HYPERION TELECOMMUNICATIONS and KANSAS CITY FIBER NETWORK L.P., *Appellants*, v. THE STATE CORPORATION COMMISSION OF THE STATE OF KANSAS, *Appellee*.

CMT PARTNERS, TOPEKA CELLULAR TELEPHONE COMPANY, INC., and AIRTOUCH CELLULAR OF KANSAS, INC., *Appellants*, v. THE STATE CORPORATION COMMISSION OF THE STATE OF KANSAS, *Appellee*.

Opinion filed August 8, 1997.

*Walker Hendrix* and *Allen Brady Cantrell,* of Topeka, consumer counsel for appellant Citizens' Utility Ratepayer Board.

*Mark P. Johnson, Lisa C. Creighton,* and *Amy E. Bauman,* of Sonnenschein Nath & Rosenthal, of Kansas City, Missouri, for appellants Kansas City Fiber Network L.P. and Multimedia Hyperion Telecommunications.

*Marc E. Elkins* and *Lisa J. Hansen,* of Morrison & Hecker L.L.P., of Kansas City, Missouri, for appellants CMT Partners, Topeka Cellular Telephone Company, Inc. and Airtouch Cellular of Kansas, Inc.

*Eva Powers, Marianne Deagle, Susan Stanley,* and *Janette Corazzin,* assistant general counsels, Kansas Corporation Commission, of Topeka, for appellee.

*Michael C. Cavell, William R. Drexel,* and *Lori A. Fink,* of Topeka, for intervenor Southwestern Bell Telephone Company.

*Mark E. Caplinger* and *James M. Caplinger,* of James M. Caplinger, Chartered, of Topeka, and *Thomas E. Gleason, Jr.,* of Gleason & Doty, Chartered, of Ottawa, for intervenors State Independent Alliance and Independent Telecommunications Group, Columbus *et al.*

Before KNUDSON, P.J., GERNON and PIERRON, JJ.

KNUDSON, J.: This consolidated appeal is brought by the Citizens' Utility Ratepayer Board (CURB) and various telecommunication providers from orders of the Kansas Corporation Commission (KCC) implementing the Kansas Telecommunications Act, K.S.A. 1996 Supp. 66-2001 *et seq.* (Kansas Act). The Kansas Act was enacted to both complement and comply with the Federal

Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (1996) (Federal Act).

Appellant CURB represents residential and small commercial ratepayers in this proceeding. See K.S.A. 66-1223.

Appellants Kansas City Fiber Network L.P. and Multimedia Hyperion Telecommunications are providers of private line and competitive access services in Kansas and have filed a joint brief. We will, hereafter, refer to these appellants collectively as KCFN.

Appellants CMT Partners, Topeka Cellular Telephone Company, Inc., and AirTouch Cellular of Kansas, Inc., are providers of commercial mobile radio service (cellular telephone service) and have filed a joint brief. We will, hereafter, refer to these appellants collectively as CMT.

There have been numerous intervenors in this proceeding. However, the only intervenors to file briefs are the State Independent Alliance, the Independent Telecommunications Group, Columbus *et al.*, and Southwestern Bell Telephone Company (SWBT). SWBT is the largest local exchange carrier providing local telephone service in Kansas.

CURB's appeal is from the final orders entered by the KCC on December 27, 1996, and February 3, 1997. KCFN's and CMT's appeals are from the same orders and reach this court by transfer from Shawnee County District Court. Although initially one or more of the parties expressed concern as to this court's jurisdiction, the issue was not briefed, and we conclude this court has jurisdiction pursuant to K.S.A. 1996 Supp. 66-118a(b).

Multiple issues are raised on appeal, but at the heart of the controversy is whether the Kansas Act and the KCC's orders implementing that Act violate or are inconsistent with the Federal Act. We conclude the KCC's final orders are not in compliance with the Federal Act and must be set aside.

*Background of Telecommunications Regulation*

Our review begins from the period following the court-ordered divestiture of local operating companies by American Telephone and Telegraph Company (AT&T) in *United States v. American Tel.*

*and Tel. Co.*, 552 F. Supp. 131 (D.D.C. 1982), *aff'd* 460 U.S. 1001, 75 L. Ed. 2d 472, 103 S. Ct. 1240 (1983).

The following information provides a history of telephone regulation in Kansas and the opposing perspectives regarding the role of the KCC. See Moline & Drexel, *The TeleKansas Debate: Incentive Regulation or Deregulation?*, 4 Kan. J.L. & Pub. Pol'y 41 (Winter 1995).

After divestiture, SWBT came before the KCC with a rate application on January 1, 1984. Under this application, the KCC approved local rates for basic telephone service that have remained unchanged up to the present time. In 1990, an alternative regulatory plan called TeleKansas was agreed upon between the KCC and SWBT. Under that plan, the KCC abandoned historic rate-based regulation in favor of price regulation. SWBT agreed not to increase basic rates and agreed to expend an additional $140 million to modernize its infrastructure within Kansas. TeleKansas was intended to provide SWBT with price flexibility not afforded by traditional rate-based regulation. The plan was not without skeptics, who voiced concerns that SWBT's profits would not be subject to KCC scrutiny. The KCC and SWBT agreed TeleKansas would conclude in 1995 with a review of SWBT's earnings. Interested parties and the KCC would then assess the benefits and costs of price regulation versus traditional rate-of-return regulation and reconsider the regulatory scheme that best promoted quality telecommunication service and a first-rate infrastructure in Kansas.

In 1993, SWBT wanted the KCC to agree to continue with price regulation after TeleKansas expired. The KCC was reluctant to do so without investigating SWBT's earnings. After SWBT was unable to reach agreement with the KCC, it was instrumental in persuading the Kansas Legislature in 1994 to extend TeleKansas until March 1, 1997. See K.S.A. 1996 Supp. 66-1,197.

This prevented the KCC from investigating SWBT's earnings, while continuing the caps on basic local service. Additionally, this legislation required SWBT to spend an additional $64 million on infrastructure within the state of Kansas. No rate reductions were imposed.

The 1994 legislature also adopted S. Con. Res. 1627 (L. 1994, ch. 371), which directed the KCC to proceed as follows:

*"Be it further resolved:* That the Corporation Commission shall upon passage of this resolution open one or more generic dockets to investigate the level of competition for each regulated or flexibly regulated telecommunications service under its jurisdiction. In addition the commission should:

(a) Periodically assess the level of competitiveness of such services and emerging services with the intent of encouraging development of effective competition for telecommunications services where feasible, including the removal of existing barriers to entry;

(b) establish a classification system for telecommunications services based on the degree of competition faced by providers of the particular service;

(c) establish standards and procedures by which the rates, terms and conditions of telecommunications services are regulated in accordance with their classification as in clause (b) above;

(d) ensure that regulated services will not subsidize competitive or unregulated services;

(e) define universal service, determine the extent to which it has been achieved in every region of the state and establish appropriate policies to insure universal service in high-cost areas of the state;

(f) define criteria for provision of 'basic telephone service' and the availability and provision of such service in a competitive environment;

(g) develop a procedure for ensuring the quality of telecommunications services; and

(h) define 'lifeline telephone service' and specification as to the appropriate means of funding the provision of such service."

In compliance with the above resolution, in April 1994, the KCC established docket 190,492-U, *In the Matter of a General Investigation into Competition within Telecommunications Industry in the State of Kansas.* Phase I of the docket dealt with the probable direction of the industry and the role of the KCC to promote competition and insure quality service and products for the consumer at affordable and reasonable costs. An order on Phase I of the docket was issued in May 1995 that determined three major features of the current regulatory structure should be modified:

"I. Universal service mechanisms must be revised to be competitively neutral and sustainable in a more competitive environment.

"II. An alternative to traditional ratebase/rate of return regulation must be established.

"III.  Existing barriers to competition must be reduced or eliminated wherever a cost effective means of doing so is available."

On February 8, 1996, the Federal Act was signed into law. This historic legislation mandates that local telecommunications markets be opened to competition.

In April 1996, the KCC scheduled hearings for August 1996 on Phase II of docket 190,492-U, intended to result in specific orders regarding regulation of the industry. In late May 1996, the KCC revised its Phase II procedural orders to accommodate the recently enacted Federal Act and expanded the scope of the upcoming hearings to include issues of rate rebalancing, universal service funding, and intrastate access rate reductions.

On May 17, 1996, the Kansas Act was signed by Governor Graves. Unquestionably, the Kansas Act was a response to the winding down of TeleKansas and the enactment of the Federal Act. The legislation was intended to "ensure that consumers throughout the state realize the benefits of competition through increased services and improved telecommunications facilities and infrastructure at reduced rates." K.S.A. 1996 Supp. 66-2001(b).

### Issues Preserved for Appeal

Before turning to the particulars of this litigation, we first must consider the contention of the KCC and SWBT that we lack jurisdiction to consider some of the issues raised by CURB because its petition for reconsideration does not comply with the requirements of K.S.A. 1996 Supp. 66-118b and K.S.A. 1996 Supp. 77-529(a).

CURB's petition for reconsideration of the December 27, 1996, order makes several detailed challenges to the order and then briefly lists 16 supplemental issues for rehearing and reconsideration. In its February 3, 1997, order the KCC denied reconsideration of the supplemental issues on the basis that CURB had not stated the grounds upon which it requested reconsideration with sufficient specificity as required by K.S.A. 1996 Supp. 66-118b and K.S.A. 1996 Supp. 77-529(a).

K.S.A. 1996 Supp. 66-118b provides that a party seeking review of a KCC order must petition for reconsideration of the order in accordance with K.S.A. 1996 Supp. 77-529. A party may not rely

upon any ground in a court proceeding that was not "set forth" in the petition for reconsideration. Under K.S.A. 1996 Supp. 77-529(a), the party must file a petition for reconsideration "stating the specific grounds upon which relief is requested."

The degree of specificity required in a petition for reconsideration is discussed in *Peoples Natural Gas v. Kansas Corporation Commission*, 7 Kan. App. 2d 519, Syl. ¶ 1, 644 P.2d 999, *rev. denied* 231 Kan. 801 (1982). The purpose of requiring matters to be raised in the petition for reconsideration is to inform the KCC and other parties where mistakes of law and fact were made in the order. 7 Kan. App. 2d at 525. The allegations of the grounds upon which the party considers the order to be unlawful or unreasonable must be sufficiently specific and direct to apprise the KCC and opposing parties of the actual points relied on. A general or mere allegation of unlawfulness or unreasonableness is insufficient to preserve an issue for judicial review. 7 Kan. App. 2d at 526.

This standard was restated in *In re Application of Southwestern Bell Tel. Co.*, 9 Kan. App. 2d 525, Syl. ¶ 2, 685 P.2d 304, *rev. denied* 236 Kan. 875 (1984). The party seeking review in the *Southwestern Bell* case was American Telephone and Telegraph Information Systems (AT&T-IS). In its application for rehearing, AT&T-IS had contended that the KCC order contravened the Supremacy Clause of the United States Constitution because the tariff ordered effected a de facto transfer of a wire asset in violation of federal judgments which required that the wire remain an asset of Southwestern Bell. The court found that it was not necessary for AT&T-IS to further elaborate on this argument and that this reference to the Supremacy Clause was sufficient to comply with the specificity requirement. 9 Kan. App. 2d at 536. However, a separate allegation, which simply stated that the KCC order was unlawful and contrary to an order of the Federal Communications Commission (FCC), was found to be insufficiently specific to preserve the matter for judicial review because it did not "state the manner in which" the KCC order contravened the federal order. 9 Kan. App. 2d at 537. In considering other arguments made by AT&T-IS, the court ruled that mere references to violations of the

Constitution did not give adequate notice of the arguments being made and were not sufficiently specific. 9 Kan. App. 2d at 537-38.

We conclude all but one of the supplemental issues were raised with sufficient specificity to meet statutory requirements. Although perhaps not a model for clarity and detailed explanation, the issues as stated by CURB are sufficiently specific to apprise the KCC and the other parties of the arguments being made and of the manner in which the order is claimed to be erroneous or unlawful.

The supplemental issue designated "n" in CURB's petition for reconsideration alleges the KCC's order "is not based on substantial competent evidence, fails to provide adequate findings and is unlawful." This does lack necessary specificity required under K.S.A. 1996 Supp. 77-529(a).

We would further note the supplemental issue designated "e," a claim that the KCC may not have been objective in its application of the Kansas Act, was not briefed on appeal and is accordingly deemed waived or abandoned. See *Friends University v. W. R. Grace & Co.*, 227 Kan. 559, 561, 608 P.2d 936 (1980).

The determination we have made leads to a new question that must be resolved. The supplemental issues properly presented in CURB's petition were not considered on their merits by the KCC. The question arises as to whether they ought to be remanded for consideration.

Some of the claims were covered in requests for reconsideration filed by other parties and were addressed by the KCC in its order on reconsideration. The other supplemental issues either make constitutional claims or present matters requiring judicial determination. We conclude this court is the proper forum to first consider and decide those issues. See *Zarda v. State*, 250 Kan. 364, 367, 826 P.2d 1365, *cert. denied* 504 U.S. 973 (1992).

### The Federal Act

The Federal Act is historic legislation intended to deregulate the telecommunications industry, open local and long distance markets to competition, and ensure universal telephone service for all citizens at affordable rates. CURB, KCFN, and CMT contend the Kansas Act and the subsequent actions taken by the KCC violate

the Federal Act. It is, therefore, necessary that we consider certain key provisions of the Federal Act. We will then review the Kansas Act and the orders entered by the KCC.

Section 253 of the Federal Act prohibits a state by statute or regulation from prohibiting or unreasonably impeding the ability of any telecommunications entity from providing interstate or intrastate service. 110 Stat. 70.

We note the concept of universal service is crucial in the calculus of deregulation. As the nation moves from monopolistic regulation to market competition, the quality of telecommunication service to the consumer must be preserved at an affordable cost.

Section 254(a) provides that a Federal-State Joint Board on Universal Service is to recommend to the FCC the definition of services to be supported by federal universal support mechanisms. 110 Stat. 71.

Section 254(b) and (c) read as follows:

"(b) UNIVERSAL SERVICE PRINCIPLES. The Joint Board and the Commission shall base policies for the preservation and advancement of universal service on the following principles:

(1) QUALITY AND RATES. Quality services should be available at just, reasonable, and affordable rates.

(2) ACCESS TO ADVANCED SERVICES. Access to advanced telecommunications and information services should be provided in all regions of the Nation.

(3) ACCESS IN RURAL AND HIGH COST AREAS. Consumers in all regions of the Nation, including low-income consumers and those in rural, insular, and high cost areas, should have access to telecommunications and information services, including interexchange services and advanced telecommunications and information services, that are reasonably comparable to those services provided in urban areas and that are available at rates that are reasonably comparable to rates charged for similar services in urban areas.

(4) EQUITABLE AND NONDISCRIMINATORY CONTRIBUTIONS. All providers of telecommunications services should make an equitable and nondiscriminatory contribution to the preservation and advancement of universal service.

(5) SPECIFIC AND PREDICTABLE SUPPORT MECHANISMS. There should be specific, predictable and sufficient Federal and State mechanisms to preserve and advance universal service.

(6) ACCESS TO ADVANCED TELECOMMUNICATIONS SERVICES FOR SCHOOLS, HEALTH CARE, AND LIBRARIES. Elementary and secondary schools and classrooms, health care providers, and libraries should have access to advanced telecommunications services as described in subsection (h).

(7) ADDITIONAL PRINCIPLES. Such other principles as the Joint Board and the Commission determine are necessary and appropriate for the protection of the public interest, convenience, and necessity and are consistent with this Act.

"(c) DEFINITION.

(1) IN GENERAL.—Universal service is an evolving level of telecommunications services that the Commission shall establish periodically under this section, taking into account advances in telecommunications and information technologies and services. The Joint Board in recommending, and the Commission in establishing, the definition of the services that are supported by Federal universal service support mechanisms shall consider the extent to which such telecommunications services—

(A) are essential to education, public health, or public safety;

(B) have, through the operation of market choices by customers, been subscribed to by a substantial majority of residential customers;

(C) are being deployed in public telecommunications networks by telecommunications carriers; and

(D) are consistent with the public interest, convenience, and necessity." 110 Stat. 71-72.

Section 254(f) provides that the obligation and duty of the states shall be as follows:

"A State may adopt regulations not inconsistent with the Commission's rules to preserve and advance universal service. Every telecommunications carrier that provides intrastate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, in a manner determined by the State to the preservation and advancement of universal service in that State. A State may adopt regulations to provide for additional definitions and standards to preserve and advance universal service within that State only to the extent that such regulations adopt additional specific, predictable, and sufficient mechanisms to support such definitions or standards that do not rely on or burden Federal universal service support mechanisms." 110 Stat. 73.

Section 254(i) explicitly mandates that "[t]he Commission and the States should ensure that universal service is available at rates that are just, reasonable, and affordable." 110 Stat. 75.

Section 254(k) prohibits telecommunications carriers from using services that are not competitive (for example, local exchange basic service) to subsidize services that are subject to competition. It also requires states to establish "any necessary cost allocation rules, accounting safeguards, and guidelines to ensure that services included in the definition of universal service bear no more than a

reasonable share of the joint and common costs of facilities used to provide those services." 110 Stat. 75.

## The Kansas Act

Public policy is set forth in K.S.A. 1996 Supp. 66-2001, which reads:

"It is hereby declared to be the public policy of this state to:

(a) Ensure that every Kansan will have access to a first class telecommunications infrastructure that provides excellent services at an affordable price;

(b) ensure that consumers throughout the state realize the benefits of competition through increased services and improved telecommunications facilities and infrastructure at reduced rates;

(c) promote consumer access to a full range of telecommunications services, including advanced telecommunications services that are comparable in urban and rural areas throughout the state;

(d) advance the development of a statewide telecommunications infrastructure that is capable of supporting applications, such as public safety, telemedicine, services for persons with special needs, distance learning, public library services, access to internet providers and others; and

(e) protect consumers of telecommunications services from fraudulent business practices and practices that are inconsistent with the public interest, convenience and necessity."

## The duties of the KCC stated in the Act include:

"(a) Adopt a definition of 'universal service' and 'enhanced universal service,' pursuant to subsections (p) and (q) of K.S.A. 1996 Supp. 66-1,187;

. . .

"(c) on or before July 1, 1996, the commission shall initiate a proceeding to adopt guidelines to ensure that all telecommunications carriers and local exchange carriers preserve and enhance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services and safeguard the rights of consumers;

. . .

"(h) on or before January 1, 1997, establish the Kansas universal service fund pursuant to K.S.A. 1996 Supp. 66-2008, hereinafter referred to as the KUSF, and make various determinations relating to the implementation of such fund." K.S.A. 1996 Supp. 66-2002.

In K.S.A. 1996 Supp. 66-2005(b), the legislature provided that each local exchange carrier (LEC) is to file a regulatory reform plan during 1997 and may elect price cap regulation or traditional rate of return regulation.

An LEC is defined as "any telecommunications public utility or its successor providing switched telecommunications service within any local exchange service area, as approved by the commission on or before January 1, 1996." K.S.A. 1996 Supp. 66-1,187.

K.S.A. 1996 Supp. 66-2005(u) provides: "No audit, earnings review or rate case shall be performed with reference to the initial prices filed as required herein."

The Kansas Act mandates that, subject to KCC approval, all LECs are to reduce intrastate access and toll charges for long distance services over a 3-year period with the objective of equalizing interstate and intrastate rates in a *revenue neutral* manner. In addition, the Kansas Act provides:

"The commission is authorized to rebalance local residential and business service rates to offset the intrastate access and toll charge reductions. *Any remaining portion of the reduction in access and toll charges not recovered through local residential and business service rates shall be paid out from the KUSF pursuant to K.S.A. 1996 Supp. 66-2008.*" (Emphasis added.) K.S.A. 1996 Supp. 66-2005(c).

The legislature then provided for the funding of the KUSF in K.S.A. 1996 Supp. 66-2008, which states, in material part:

"On or before January 1, 1997, the commission shall establish the Kansas universal service fund, hereinafter referred to as the KUSF.

"(a) The initial amount of the KUSF shall be comprised of local exchange carrier revenues lost as a result of rate rebalancing pursuant to subsection (c) of K.S.A. 1996 Supp. 66-2005 and subsection (a) of K.S.A. 1996 Supp. 66-2007. *Such revenues shall be recovered on a revenue neutral basis.* The revenue neutral calculation shall be based on the volumes and revenues for the 12 months prior to September 30, 1996, adjusted for any rate changes.

"(b) *The commission shall require every telecommunications carrier, telecommunications public utility and wireless telecommunications service provider that provides intrastate telecommunications services to contribute to the KUSF on an equitable and nondiscriminatory basis. Any telecommunications carrier, telecommunications public utility or wireless telecommunications service provider which contributes to the KUSF may collect from customers an amount equal to such carrier's, utility's or provider's contribution.*" (Emphasis added.)

Only LECs that provided switched local exchange services in the state prior to January 1, 1996, are to serve as the carrier of last resort within their exchanges and shall be eligible to receive KUSF funding. K.S.A. 1996 Supp. 66-2009.

## The KCC's Final Orders

The KCC issued its final order on December 27, 1996, and its order denying reconsideration on February 3, 1997. Highly summarized, the orders provide, in material part:

1. Intrastate toll and access rates for long distance service will be reduced by $111.6 million over a 3-year period with the objective of equalizing interstate and intrastate rates in a "revenue neutral, specific and predictable manner."

2. The initial amount of the KUSF shall offset revenues lost by the LECs as a result of the reduction in long distance rates.

3. Every telecommunications carrier, telecommunications public utility, and wireless telecommunications service provider shall contribute to the KUSF based upon the carrier's share of total intrastate retail revenues.

4. "Rate rebalancing" under the Kansas Act is irrelevant since the KCC has opted to offset the rate reductions by assessments rather than rate increases.

5. Payments to and distributions from the KUSF to the LECs may be offset to avoid unnecessary fund transfers.

6. Rates for pay phone calls shall be increased to $.35, and the free call allowances for directory assistance are eliminated.

## Analysis

### (a) KCC jurisdiction of wireless providers

CMT contends the KCC has illegally exercised jurisdiction over it in violation of K.S.A. 66-1,143(b), which provides: "[N]o radio common carrier shall be subject to the jurisdiction, regulation, supervision and control of the state corporation commission." CMT argues that K.S.A. 1996 Supp. 66-2008(b), which requires wireless providers to contribute to the KUSF, impermissibly confers jurisdiction.

Section 254(f) of the Federal Act gives states the authority to require every telecommunications carrier that provides intrastate services to contribute to a state universal service program. 110 Stat. 73. Requiring CMT to make an equitable contribution to the KUSF is distinguishable from its regulation by the KCC. The federal district court of Kansas has concluded that this provision does

not conflict with 47 U.S.C. § 332(c)(3)(A) (1994). In its ruling, the federal court stated that the KUSF contribution imposed by the KCC was not a regulation of rates or market entry, but was simply an additional cost of doing business. *Mountain Solutions v. State Corp. Com'n of Ks.*, 966 F. Supp. 1043, 1048 (D. Kan. 1997).

We agree with the reasoning in *Mountain Solutions.* The KUSF contribution cannot be characterized as an exercise of jurisdiction contrary to K.S.A. 66-1,143(b).

*(b) The constitutional issues of vagueness and improper delegation of legislative authority*

CURB maintains that the concept of "revenue neutrality" as used in K.S.A. 1996 Supp. 66-2005(c) and K.S.A. 1996 Supp. 66-2008(a) is unconstitutionally vague. CMT also claims the legislature's use of the terms "revenue neutral" and "equitable and non-discriminatory" in 66-2008 without definition or standards constitutes an improper delegation of power to the KCC. CMT further claims that the legislature has improperly delegated its taxing authority to the KCC.

Interpretation of the Kansas Act is a question of law. The constitutionality of a statute is presumed, and all doubts must be resolved in favor of its validity. *Guardian Title Co. v. Bell*, 248 Kan. 146, 149, 805 P.2d 33 (1991). The statute in *Guardian Title* applied only to title insurers and agents. The Supreme Court noted that it did not apply to the average citizen, but to a heavily regulated industry with specialized knowledge of the industry and its terms. 248 Kan. at 150, 152.

Likewise, the challenged portions of the Kansas Act do not proscribe the conduct of individual citizens or regulate the public at large. The language is directed at the KCC and its implementation of statutory mandates in the telecommunications area. The statute applies to a highly specialized, closely regulated industry.

CURB contends that "revenue neutrality" has no commonly accepted meaning and that the term is so vague and indefinite that the parties use it to support contradictory positions. We do not

agree. The fact that the parties may have different opinions of what the phrase requires does not mean the statute is unconstitutional. *Cf. Boatright v. Kansas Racing Comm'n,* 251 Kan. 240, 244-45, 834 P.2d 368 (1992).

CMT argues that the KUSF contribution assessed on its intrastate revenues is a tax and there is no constitutional authorization for the legislature to delegate its taxing authority to the KCC. A "tax" is a forced contribution to raise revenue for the maintenance of governmental services offered to the general public. *Executive Aircraft Consulting, Inc. v. City of Newton,* 252 Kan. 421, 427, 845 P.2d 57 (1993). The KUSF is not for the benefit of the general public. The monies from the KUSF are to be distributed only to certain qualifying members of the telecommunications industry. K.S.A. 1996 Supp. 66-2008(c). We conclude the KUSF assessment is not a tax.

CMT also argues that "revenue neutral" and "equitable and non-discriminatory" are not defined in the Kansas Act, are vague, and are inadequate standards for the KCC to follow. CMT further argues that the legislature has given the KCC insufficient guidelines for rate rebalancing and for funding the KUSF and that there are inadequate standards to control the actions of the KCC.

A statute delegating legislative authority must fix reasonable and definite standards to establish the manner and exercise of the power delegated. The legislature may, however, enact statutes in broad outline and authorize an administrative agency to fill in the details. In testing a statute for adequacy of standards, the character of the administrative agency is important. What is a sufficient standard varies somewhat according to the complexity of the areas sought to be regulated. Standards may also be inferred from the statutory purpose. The trend is to require less detailed standards and guidance to administrative agencies in order to facilitate the administration of laws in areas of complex social and economic problems. Great leeway should be afforded the legislature in setting such standards. See *State v. Ponce,* 258 Kan. 708, 712-13, 907 P.2d 876 (1995); *Guardian Title,* 248 Kan. at 154.

Matters concerning public utilities have been recognized as being highly complex, and the KCC is recognized to have vast ex-

pertise and discretion in regulating utilities. *Kansas Gas & Electric Co. v. Kansas Corporation Comm'n*, 239 Kan. 483, 495, 720 P.2d 1063 (1986).

We agree with the KCC and SWBT that the term "revenue neutral" is commonly used in the regulatory arena and has a recognized meaning. Technical terms and phrases, and other words and phrases in a statute that have acquired a peculiar and appropriate meaning, are construed according to those meanings. *Boatright*, 251 Kan. at 245. The words "equitable and nondiscriminatory" have an understandable meaning that gives adequate direction to the KCC. It is within the expertise of the KCC to apply those standards in the decision-making process. No unlawful delegation of legislative authority has been shown.

*(c) The concept of revenue neutrality and the prohibition against audits*

We believe there are two basic, fatal flaws in the KCC order centering on the $111.6 million access reduction and the establishment of the KUSF that arise out of the concept of revenue neutrality in K.S.A. 1996 Supp. 66-2008(a) and K.S.A. 1996 Supp. 66-2005(c) and the prohibition against audits and earnings review in K.S.A. 1996 Supp. 66-2005(u).

The revenue neutral concept is foreign to the Federal Act and was obviously intended by the Kansas Legislature to protect revenues by incumbent LECs facing a $111.6 million loss of earnings as a result of reductions in long distance rates and toll charges. Additionally, the legislature authorized the KCC to rebalance local residential and business service rates to offset the $111.6 million reduction but, in any event, there was to be no audit, earnings review, or rate case with reference to an LEC's initial prices filed pursuant to K.S.A. 1996 Supp. 66-2005(b). This legislation is inconsistent with the provisions of the Federal Act, specifically §§ 254(b)(4), (b)(5), (f), and (i), and prevented the KCC from performing its regulatory responsibilities in general and insuring compliance by carriers with § 254 (k) of the Federal Act.

As we have already observed, the purpose of the KUSF is to ensure that all Kansans have access to universal service at afford-

able rates. It is impossible for the KCC to determine an affordable rate for universal service without being able to perform an audit or earnings review of the incumbent LECs. While it is true that basic telephone rates have not increased in Kansas since 1984, the industry has seen an incredible explosion of new technology that results in substantial economies of scale with a reduction in the per line cost for basic telephone service.

What is the cost of basic telephone service in Kansas? We have no answer from the record before us. What is the cost to provide universal service? We have no answer from the record before us. The funding level of $111.6 million for the KUSF was preordained by the Kansas Legislature once the concept of revenue neutrality and the prohibition against investigation of profits was written into the Kansas Act. Modification of local telephone rates was made highly problematical. There would have been inadequate regulatory review to determine the propriety of any rate changes. This made inevitable the KCC decision to set the funding level of the KUSF in an amount equal to the intrastate access and toll reductions.

The result is a final order that fully protects incumbent LECs by shifting lost revenues from one corporate pocket to another while requiring all other providers and consumers to bear the financial burden of "revenue neutral" regulation. The funding methodology also precludes meaningful review of whether LECs are using services that are not competitive to subsidize services that are subject to competition. Finally, the KCC order has created a $111.6 million fund that bears no rational relation to the concept of universal service and its cost.

We conclude the record on appeal does not contain substantial competent evidence to support the KCC's actions regarding the KUSF as required under K.S.A. 77-621(c)(7). In addition, the orders were made without foundation in fact and are unreasonable, arbitrary, and capricious, contrary to K.S.A. 77-621(c)(8).

We also note CURB's contention that to prohibit the KCC from considering costs or earnings of the incumbent LECs impermissibly conflicts with its statutory mandate as a regulatory agency. The KCC has the obligation to ensure that telecommunications

rates, charges, and tolls are just and reasonable. It has the authority to investigate whether rates or schedules are in any respect unfair, unjust, unreasonable, inefficient, unjustly discriminatory, or unduly preferential. See K.S.A. 66-1,187 *et seq.* We agree. The statutory prohibition against audits and the concept of revenue neutrality are clearly inconsistent with the obligation of the KCC to ensure just and reasonable rates and charges for the consumers of Kansas.

*(d) Compliance of KCC final orders with the Kansas Act*

Because of the reasons we have concluded the KCC orders must be reversed, the various issues concerning whether its final orders are in conformity with the Kansas Act are largely rendered moot. Upon remand, the KCC must comply with the Federal Act in establishing local rates and funding of the KUSF. In this context, its order must be consistent with §§ 254(f), (i), and (k). Compliance should result in contributions to the KUSF by individual entities on an "equitable and nondiscriminatory" basis, as required under K.S.A. 1996 Supp. 66-2008(b).

CMT and KCFN maintain that KUSF contributions under the KCC orders are not made on an equitable and nondiscriminatory basis. In part, their argument is that the revenue neutral requirement in the Kansas Act gives the LECs an unfair competitive advantage. Also, an equal assessment may be discriminatory or create a barrier to competition. These concerns have merit. As we have stated, without a thorough analysis of cost information, the equitable and nondiscriminatory standard of K.S.A. 1996 Supp. 66-2008(b) cannot be shown to have been met. We have no doubt that the KCC, upon remand, will give these issues careful consideration.

CMT has also asserted that the KCC orders have a discriminatory impact against wireless companies. It argues that the wireless companies have developed their own infrastructure to serve customers, that their situation is unlike that of any landline provider of telecommunications services, and that it is anti-competitive to force them to subsidize the incumbent LECs. The KCC noted that the wireless companies did not provide evidence at the hearing to establish a basis for treating them differently from other providers.

This is correct, but we conclude the absence of evidence was due to CMT not being given proper notice of the proceedings or a reasonable opportunity to prepare for the hearings. Here again, these concerns that have been raised by CMT have merit and, upon remand, should be given a proper airing and consideration by the KCC.

*(e) The allocation of costs attributable to the local loop*

Another difficulty is the methodology relied upon to determine payouts from the KUSF to the LECs. Local loop cost is the cost of providing access to the telecommunications network. The loop consists of the wires that connect the customer's premises to the central office serving the customer. The same loop facilities provide all services; for example, local, interstate, and advanced services. Approximately 75% of the cost of basic residential service is the cost of the local loop. However, the amount of support to be paid LECs from the KUSF was based upon allocating 100% of the loop costs to basic local service.

Section 254(k) of the Federal Act directs the states to establish safeguards and guidelines to ensure that services related to universal service "bear no more than a reasonable share of the joint and common costs of facilities used to provide those services." 110 Stat. 75. We believe the KCC orders unduly burden the basic local service consumer with loop costs that are attributable to other services. Upon remand, the KCC should make reasonable effort to ensure that a reasonable apportionment of the costs of the local loop are made.

*(f) Notice issues*

For all of the foregoing reasons stated, we conclude the KCC's final orders establishing, implementing, and funding the KUSF must be set aside and this matter remanded to the KCC for further hearing and consideration in accordance with this opinion. Our opinion also requires that the KCC's decision to allow an increase in pay phone and directory assistance rates must also be set aside since that decision was part and parcel of the KUSF funding decision.

Upon remand, the KCC must disregard the concept of revenue neutrality as expressed or implied in K.S.A. 1996 Supp. 66-2005(c)

and K.S.A. 1996 Supp. 66-2008, as it is wholly inconsistent with the Federal Act and the public policy of Kansas as expressed in K.S.A. 1996 Supp. 66-2001. Likewise, the KCC must disregard the provision of K.S.A. 1996 Supp. 66-2005(u) that prohibits any audit or earning review. The KCC cannot meet its general regulatory responsibilities or those mandated under the Federal Act without a complete and thorough review of the earnings of the LECs.

Reversed and remanded.